# Mullen *v.* Johnson, *et al.*

## *Contest of Will.*

(Decided Dec. 1, 1908. 47 South. 584.)

1. *Wills; Mutual Wills as Contracts.*—Mutual wills between husband and wife do not raise a contractual relation, and in determining the validity of one of such wills the existence or non existence of the other is immaterial.

2. *Same; Testamentary Capacity.*—One has the requisite testamentary capacity if he has mind and memory enough to know and remember his property and the objects of his bounty, and to know the nature of his testamentary acts.

3. *Same; Validity; Undue Influence.*—Mere persuasion, addressed to the testator's judgment and affections, does not constitute undue influence to avoid the will; the undue influence which will avoid a will must amount to coercion or fraud; and must involve such force or fear as destroys the free agency of the testator, and constrains him to that which is against his will.

[Mullen v. Johnson, et al.]

4. *Same; Burden of Proof.*—The rule, that where parties to a gift occupy a relation of confidence, the burden is on the donee to rebut the presumption of undue influence, has no application to wills.

5. *Same; Evidence.*—The evidence in this case examined, and held insufficient to show that the execution of the will was induced by undue influence.　(Tyson, C. J., dissents.)

APPEAL from Dallas Chancery Court. .

Heard before Hon. THOMAS H. SMITH.

Bill by Leonard D. Mullin against Thomas M. Johnson and others to annul a will. From a decree for respondent complainants appeal. Affirmed.

W. W. QUARLES, and PETTUS, JEFFRIES & PETTUS, for appellant. The relation between the testatrix and appellee is that of confidential relation.—*Holt v. Agnew,* 67 Ala. 360. This cast the burden of proving the transaction fair and just upon appellee.—*Walker v. Nicrosi,* 135 Ala. 355; *Cannon v. Gilmer,* 135 Ala. 304; *Shipman v. Furniss,* 69 Ala. 556; *Bankcroft v. Otis,* 91 Ala. 279; *Kyle v. Purdue,* 95 Ala. 579; *Kidd v. Williams,* 132 Ala. 140. Where the dominant party receives the benefit during the existence of the relation the party reposing the confidence may obtain relief from the burdens and duties imposed simply by showing the transaction and the confidential relation.—*McQueen v. Wilson,* 131 Ala. 609; *Noble v. Moses,* 81 Ala. 540; *Harraway v. Harraway,* 136 Ala. 502; *Coghill v. Kennedy,* 119 Ala. 653. These being the rules, the burden of showing the validity of the alleged will is upon the husband of the dead wife.— *McCutchins v. Loggins,* 109 Ala. 462; *Kumpe v. Coons,* 63 Ala. 448; *Hill v. Barge,* 12 Ala. 687; *Johnson v. Glasscock,* 2 Ala. 218; Sec. 4298, Code 1896. A non expert witness who has only a casual acquaintance with the testatrix cannot testify as to her sanitay vel non nor can such a witness testify as to the effect of medicines on the testatrix.—*Dominic v. Randolph,* 124 Ala. 557; *Ber-*

[Mullen v. Johnson, et al.]

*ney v. Torrey,* 100 Ala. 172; *Ford v. The State,* 71 Ala.
397. Declarations of the testatrix in regard to her wish-
es concerning the distribution of her property after her
death, are competent evidence.—*Coghill v. Kennedy, su-
pra; Bulger v. Ross,* 98 Ala. 273; *Hughes v. Hughes,* 31
Ala. 524; *Bunard v. McElroy,* 21 Ala. 361.

MALLORY & MALLORY, for appellee. On the question
of testamentary capacity the attention is called to the
following authorities.—*Bulger v. Ross,* 98 Ala. 267;
*Schieffelin v. Schieffelin,* 127 Ala. 14; *Cramer v. Wein-
ert,* 81 Ala. 414; *O'Donnell v. Ruteger,* 76 Ala. 222;
*Stubbs v. Houston,* 33 Ala. 555; *Taylor v. Kelly,* 31 Ala.
59; *Murphy v. Sand,* 107 Ala. 424; 82 N. C. 451; 27 Ia.
110; 21 Mich. 141; 94 Ill. 560; 9 Conn. 102; 31 Am. St.
Rep. 422; 77 Am. St. Rep. 446. On the presumption and
burden of proof counsel cite the authorities supra, and
*Brownwell v. Murrell,* 108 Ala. 366; *Eastes v. Mont-
gomery,* 95 Ala. 486; *Knox v. Knox,* 95 Ala. 495; *John-
ston v. Armstrong,* 97 Ala. 371; 64 Am. St. Rep. 576;
31 Am. St. Rep. 665. As to temporary causes affecting
testamentary capacity they cite the following.—43 N.
J. E. 573; 2 N. Y. Supp. 97; 25 A. & E. Ency. of Law,
990-1001; Jarmon on Wills (4th Ed.), 97. On the compe-
tency of witnesses and the fact that interest does not
disqualify they cite the following.—*Kumpe v. Coons,* 63
Ala. 448; *Henry v. Hall,* 106 Ala. 84; *Berney v. Torry,
supra; Ragland v. The State,* 125 Ala. 12; *Yarbrough
v. The State,* 105 Ala. 54; *Walker v. Walker,* 34 Ala.
469; *Dominic v. Randolph, supra.*

McCLELLAN, J.—Annie M. Johnson died in August,
1901, childless, survived by her husband, Thomas M.
Johnson, and the complainant, a brother, the only heir
at law. The instrument contested, purporting to be a
will and to have been executed on June 20, 1901, gave

the entire estate of Mrs. Johnson to her husband. The grounds of contest are: First, want of testamentary capacity to make a will; second, undue influence exerted upon the alleged testatrix by Thomas M. Johnson, the husband, Henry B. Johnson, the brother-in-law of Mrs. Johnson, and Fannie M. Smith, or by some of these named. Upon the occasion of the execution of the contested instrument, Thomas M. Johnson executed a last will and testament in which Annie M. Johnson was the sole beneficiary. The determination of the issues thus made in the cause will be greatly simplified by the elimination, as must be done, of the influence of any contractual factor in the premises. Though the instruments executed by Mr. and Mrs. Johnson were mutual, there is no element of contract inhering in the respective actions of these persons. Either instrument was revocable and neither, in terms or as explained by fact, imports any consideration as an inducement to the execution of her or his purported will. Indeed, the solicitors for complainant do not insist that the arrangement, or action taken, was contractual inter vivos—capable of enforceable specific performance. Under these circumstances there can be no two opinions upon the proposition that the law applicable to the issues presented in the cause is only those rules of evidence and substantive law pertinent to testamentary instruments. In consequence the somewhat extended argument of the solicitors for complainant, that seems to seek the application to the stated issue of undue influence of the principles controlling the determination of such issues in cases of transactions inter vivos, cannot be considered for any purpose on this appeal. This instrument must stand or fall, upon the issues made, as a will, not as a contract.

The requisite mental capacity to make a valid will has been repeatedly defined by this court; and these words,

[Mullen v. Johnson, et al.]

taken from *Taylor v. Kelly,* 31 Ala. 72, 68 Am. Dec. 150, express the standard therefor as that standard has been consistently declared and maintained by our later adjudications: "If she [testatrix] had memory and mind enough to recollect the property she was about to bequeath, and the persons to whom she wished to will it, and the manner in which she wished it to be disposed of, and to know and understand the business she was engaged in, she had, in contemplation of law, a sound mind; and her great age, bodily infirmity, and impaired mind would not vitiate a will made by one possessing such capacity."

The burden assumed by the contestant (complainant) to establish mental incapacity is not grounded upon a state of habitual insanity affecting Mrs. Johnson at or prior to June 20, 1901; but such incapacity is predicated, in the testimony for contestant, upon a condition of mind wrought by the use of narcotics, which, with the cancerous disease inflicting her, it is urged, affected to destroy the requisite mental capacity of Mrs. Johnson to make a valid disposition of her property. This condition, asserted to have produced the disqualifying result indicated, was necessarily "temporary or ephemeral in its nature," if present at any time prior to the execution of the instrument. No presumption of its continuance on that occasion can be indulged.—*O'Donnell v. Rodiger,* 76 Ala. 222, 52 Am. Rep. 322. Indeed, from the testimony for the contestant, alone, it is apparent that the disease, in and of itself, though inflicting intense pain and causing swelling of the arm, breast, side, shoulder, face, and neck did not result in any mental impairment or dethronement within the standard declared in the quotation from *Taylor v. Kelly, supra.* The whole insistence, then, resolves itself into the issue of fact whether the presumption of the soundness of Mrs. Johnson's

mind, at the time the contested instrument was execut-
ed, has been rebutted upon the whole testimony in the
cause.—*O'Donnell v. Rodiger, supra.* Upon this issue
more than two score witnesses were examined. Obvi-
ously we cannot enter upon a discussion of the entire
record in this respect. We must content ourselves with
a treatment in nature summary.

In a general sense the testimony for complainant and
that for respondents is in irreconcilable conflict, though
it must also be said that upon the specific point of the
issue, viz., her mental status at the time of alleged execu-
tion, comparatively few of the whole number of the wit-
nesses testify. On both sides the mental status of Mrs.
Johnson, both before and after June 20, 1901, is the sub-
ject of opinions, favorable and unfavorable. For the
contestant, many of his witnesses, while giving opinions
opposed to her soundness of mind, evince unmistakable
evidences of their opinions in that regard being unjusti-
fied by facts to which they testify. Some of them predi-
cate their opinions on the mere fact that the stricken
woman did not enter readily into conversations in pro-
gress about her, or, when under the influence of opiates
and dozing therefrom, that she uttered incoherent or
random expressions; and still others rest their opinions
against her soundness of mind upon the asserted fact
that Mrs. Johnson was in a stupor from the use of nar-
cotics, at least from the 17th to the 20th of June. These
conditions might all very well exist at times and be whol-
ly absent at other times—might very well prevail and
yet when the sick woman was aroused, or the effect of
the opiate had been spent, leave her with such an un-
clouded mind as that she could measure in mental
strength, up to the standard declared to be requisite in
*Taylor v. Kelly.* And, in this immediate connection,
touching the effect of morphine upon the mental ability

[Mullen v. Johnson, et al.]

to make a valid will, it may be said that the testimony for contestant is notably obscure with respect to the mental capacity of Mrs. Johnson after being aroused from the languor caused by the opiate, or after the opiate had begun to wane in its palliating effect or had spent its power. Aside from these general criticisms of contestant's testimony, a reading of it cannot fail to induce the conclusion that several of his witnesses reached and entertained opinions of the mental unsoundness of Mrs. Johnson after the most casual observations of her. Apart from the question of admissibility of the opinions of such witnesses on the issue, these opinions could or should carry very little weight. The law declares the standard of mental capacity requisite to make a valid will and the habits, infirmities, diseases, or mental stresses of one undertaking a testamentary disposition of property will not be suffered to deny efficacy to that effort, because of mental incapacity, if the proposed testator possessed, at the time he undertakes to act, the mental powers so clearly described in the quotations from *Taylor v. Kelly.* Notwithstanding the stated conditions of habit, disease, or the use of narcotics may be and are often serviceable as evidence in determining the presence, at the time of action, of the requisite mental ability to make a valid will, the issue still is and must be, not what afflicted the testator, leading possibly to a denial of the existence of his requisite will-making mental power, but what was, on the occasion, his mental status to that end, and, if it reached the standard before defined the habits, diseases, or use of narcotics to which he was subjected will not avail to defeat his testamentary hope.

The witnesses in this cause to whom must be given the credence due disinterested witnesses enjoying the best of opportunities to know that about which they testify are

[Mullen v. Johnson, et. al.]

Dr. Dubose, the physician who attended Mrs. Johnson twice daily until her death in August, and Miss Ford, the professional nurse who ministered constantly to Mrs. Johnson from early in the year 1901 to her death, except two weeks, spent in a visit away, in May of that year. These persons are witnesses to the contested instrument. That Dr. Dubose is a man and a practitioner of the highest standing is not even hinted to the contrary. From his testimony there appears no semblance of reason to doubt either its truth or the possession by him of skilled ability to reach and lucidly announce an opinion as to the soundness of Mrs. Johnson's mind when she executed this instrument. He was present when the execution was accomplished, not only in his capacity as man, but also that of physician, thoroughly acquainted with the testatrix, his patient. That he is an wholly disinterested witness is beyond dispute. Miss Ford enjoyed, in some respects, even better opportunity for observation of Mrs. Johnson's mental condition than did Dr. Dubose, in this: She was more continually with her. The testimony of this witness is attempted to be shaken in credibility by the fact that Thomas M. Johnson was generous to her after the death of his wife. We cannot sanction that result. That Miss Ford was faithful and attentive, in the line of her duty, to her patient, is not, on this record, to be denied. That Thomas M. Johnson appreciated this service to his wife, to whom the evidence in the cause shows, beyond dispute, he was thoroughly devoted, was both natural and just. His generosity to this faithful nurse after the death of his wife should, we think, in fairness and justice, to say nothing of the better quality that reluctantly ascribes to human action evil motives rather than the good, without some sound reason therefore, be imputed to his sense of appreciation of her fidelity, rather than to them both

[Mullen v. Johnson, et al.]

of a purpose to subvert the right and to perpetrtate a felonious conspiracy. Her testimony indicates no interest that fairly reflects upon its right to credence. So we therefore take her testimony in the premises as that of a disinterested witness.

Dr. Dubose's testimony is lengthy, covering a detailed account of Mrs. Johnson's malady and its progress and treatment. He affirms that from the 10th to the 20th of June, she did not take for relief from pain, and that was the only reason it was given, altogether more than five grains of morphine; that after the latter date, which was subsequent to the execution of the instrument, a new treatment was employed, and after two weeks of use it was discontinued, because of the prostrating effect on the patient; that the disease had no effect upon her mind; that the opiates administered had no effect upon her mind; that her mind remained in its normal condition of soundness; that during the month of June she was able to be up and about the house the greater part of the day; that at the time of the execution of the will her mind was sound; and that at this time her physical condition was remarkably good for one so afflicted. Remembering that this witness saw Mrs. Johnson professionally twice daily from May to August, inclusive, no comment here could add to its probative force. Miss Ford was exhaustively examined in chief and on cross. She was trained for her calling, with two years' service, at the Alabama-Bryce Hospital for the Insane. In that course of instruction she must have had unusual advantages in the observation of persons mentally afflicted. She testified that up to the time Mrs. Johnson went to Philadelphia in August she was not confined to her bed nor was she unable to walk; that she directed her household affairs, her servants reporting to her; that she (witness) was experienced in the administration of mor-

phine; that Mrs. Johnson was given, at first, one-eighth
of a grain, which, in July, was gradually increased un-
til her departure for Philadelphia, when she was taking
about seven grains a day; that the morphine never had
any effect on the mind of Mrs. Johnson, only relieved
her pain; that she was given a tonic, and from this no
ill mental effects resulted; and that at no time during
June and July was her mind impaired, nor was it other-
wise than entirely sound.

Additional to these witnesses, affirming the soundness
of Mrs. Johnson's mind, are more than a dozen who do
not appear to be inclined by bias or interest to voice any
other than a fair opinion of her mental strength. Some
of these speak of transactions or occurrences in which
Mrs. Johnson participated, and which clearly show her
to have been of sound mind. Not the least credible of
this array of witnesses are Dr. Dickinson, Mrs. John-
son's pastor, who saw her frequently in June and July,
and Dr. Massey, the Philadelphia physician who treated
her in August, and who in course of a long career in his
profession had exceptional advantages in mental and
nervous diseases. Among these advantages were three
years' service in the Pennsylvania Insane Hospital and
seven years in a prominent infirmary for nervous diseas-
es in Philadelphia, and also more than 10 years' experi-
ence in the treatment of cancerous maladies, including
the use of opiates in such treatment. Mrs. Johnson was
under the care of Dr. Massey from August 5 to August
28, 1901. He saw her during that period at least once
a day. He thus states his opinion of her mental condi-
tion: "Her mental condition during all of the period
she was under my care was perfectly sound in every
particular. She was decidedly of sound mind. She did
converse rationally. She was at no time irrational or
unintelligent. Neither her eyesight nor her hearing was

in the slightest degree impaired." When it is recalled that the use of opiates, to allay Mrs. Johnson's suffering, had been increased in July over the amount given in June, the opinion of Dr. Massey, based upon her mental condition in August, is peculiarly valuable. Dr. Dickinson testitfied that he knew Mrs. Johnson intimately for about 12 years and frequently saw her during that period; that he was her pastor; that he saw her generally once or twice a week during her illness in 1901, up to her departure for Philadelphia; that her mind was sound in May and June—in fact, it was sound on all occasions when he saw her; that "in my frequent conversations with her she always expressed herself with her usual intelligenece and mental balance;" and that in the month of June he saw no change in her mind from its "normal clearness."

Assuming the admissibility of all the testimony for contestant on this issue, and contrasting it, with patient care, with that of the respondents, notably with the evidence of the witness named and specially quoted above, we feel no hesitancy in affirming on this issue the conclusion attained by the chancellor.

The other issue relates to the before-stated undue influence exerted upon Mrs. Johnson, resutling, it is averred, in attempted execution of the instrument. With us the law by which must be determined the validity vel non of a will upon an issue of undue influence is as indisputably settled as that of mental capacity vel non to make a valid will. We cannot hope to improve in exactness of statement of the rule upon that to be found in numerous decisions of this court. It will suffice to quote one of the number: "The undue influence which will avoid a will must amount to coercion or fraud—an influence tantamount to force or fear, and which destroys the free agency of the party, and constrains him

to do what is against his will. Mere persuasion or argument addressed to the judgment or affections, in which there is no fraud or deceit, does not constitute undue influence."—*Eastis v. Montgomery,* 93 Ala. 300, 9 South. 314. In transactions inter vivos, where the parties occupy relations of confidence, the donee has the burden to rebut the presumption raised by the law that the gift was the result of undue influence. But that rule does not prevail with respect to testamentary dispositions of property between persons so relationed, unless the bene-.ficiary is shown to have exerted active interference in procuring the execution of the instrument, whereupon, and if so, the burden to rebut the presumption of undue influence passes to such beneficiary.—*Bancroft v. Otis,* 91 Ala. 279, 8 South. 286, 24 Am. St. Rep. 904; *McQueen v. Wilson,* 131 Ala. 606, 31 South. 94.

Justices HARALSON, DOWDELL, SIMPSON, ANDERSON, and DENSON, entertain the opinion that, regardless of whether the burden to refute the presumption of undue influence was upon the contestant or upon the respondent Thomas M. Johnson, on the whole evidence in the cause, on this issue, the conclusion is irresistible that the contested instrument was not the product of any undue influence in the premises. While the writer concurs in the conclusion of fact just stated, he prefers to ground his opinion, in affirmance of the chancellor's view, upon the reason and fact to be later set forth.

The contestant insists that the requisite activity of the beneficiary, Thomas M. Johnson, in the preparation and execution of the contested instrument, was so shown as to cast upon him the onus of rebutting the presumption of undue influence thereupon arising and that, since there is no evidence in the cause tending to show "a severance of the relation by independent and competent advice," this burden was not discharged, and the

18 R

issue should have ·been accordingly resolved in favor of
the contestant. In support·of his contention *McQueen
v. Wilson,* 131 Ala. 606, 31 South. 94, is cited. While
*McQueen v. Wilson* asserts, and in that contest applied,
the rule of evidence contended for by contestant, that
decision by no means rules that only by showing a "sev-
erance of the relation by independent and competent ad-
vice" may the said presumption of undue influence be
overcome and the validity of the instrument sustained.
Otherwise put, that decision never contemplated the re-
pudiation of the broad doctrine, thus announced in *Gar-
rett v. Heflin,* 98 Ala. 615, 13 South. 326, 39 Am. St.
Rep. 89: "Affirmative evidence, in any legal mode, that
the will expresses the spontaneous intentions of the tes-
tator, satisfies the court and removes unfavorable pre-
sumptions which would otherwise be indulged." These,
among others of our decisions, recognize the doctrine
stated: *Daniel v. Hill,* 52 Ala. 430; *Lyons v. Campbell,*
88 Ala. 469, 7 South. 250; *Eastis v. Montgomery,* 95 Ala.
493, 11 South. 204, 36 Am. St. Rep. 227; *Bancroft v.
Otis,* 91 Ala. 290, 8 South. 286, 24 Am. St. Rep. 904;
*Hill v. Barge,* 12 Ala. 689.

On this issue of fact the undoubted weight of the evi-
dence is that the husband was commendably solicitous
about, and notably diligent, affectionate, and faithful to,
his wife during her long illness, and, as before stated,
that there existed between them a strong attachment.
The chancellor in his able opinion, sustaining the in-
strument on this issue, thus summarizes, and correctly,
these controlling conclusions from the whole testimony
in the cause: "After testatrix returned from the infirm-
ary, some time before the execution of the will, she was
daily and hourly attended and surrounded by her family
·and the trained nurse. The husband rarely saw her
alone, and only for a short time. The neighbors, the

[Mullen v. Johnson, et al.]

family, the servants, all seem to have been with her con-
stantly after she was confined to the house.   Prior to
that time, when the husband was more alone with her,
and had better opportunities to influence her, he dis-
suaded her from making her will, advising her to wait
until after the operation which she was then about to
undergo; that she expressed her determination to make
the will, as she did make it to several of her confidential
friends before she did so, stating her reasons for desiring
to do this.   In two separate conversations with Mrs.
Vaughan, she told her she intended to make her will,
leaving her property to her husband.   This was prior to
the California trip, and many years previous to her
death.   And again, in 1899, she told Mrs. Vaughn the
same thing.   She told Mrs. Gay, before she went to the
infirmary, that she wished her property to go to Mr.
Johnson, and in a second conversation with this witness,
after returning from the infirmary, she reiterated what
she had first said.   She stated to Mr. Henry Johnson,
after she returned from the infirmary, that she had in-
tended to make her will before going there, and again,
on the day the will was executed, told him she had her
will drawn, leaving her property to her husband, and
asked him to be on hand that evening to witness it.  She
told Miss Ford the same thing, and wished her to wit-
ness it.   Mrs. Johnson herself had the draft of the will
taken from the desk, herself called the witness to attest
it, read it, and stated that it was the way she had in-
structed it to be drawn.   She afterwards told her pastor,
the Rev. Mr. Dickinson, speaking of the probability of
her early death, that she had made her will.   There is
no evidence of any undue influence by Henry Johnson
or Fannie M. Smith.   The only evidence against her hus-
band is that he consulted the attorney and stated to him
what the testatrix desired."   And it should be added

[Mullen v. Johnson, et al.]

that no evidence of undue influence exerted by Miss Ford is presented.

As indicated, the Justices named above affirm the conclusion of the chancellor that the will was not the product of any undue influence, but was the result of the free choice and act of Mrs. Johnson, in the disposition of her estate. The writer rests his opinion in affirmance of the validity of the will on the issue of undue influence upon the fact that there is an utter absence of testimony, relieving the contestant of the burden of proof in the cause, tending even remotely to show any activity on the part of the chief beneficiary, the husband, in or about the preparation for or execution of the will of Mrs. Johnson. There is, aside from the contended-for effect of the presumption arising from such activity by a beneficiary, absolutely no proof of any effort or act on the part of any one to influence Mrs. Johnson to execute the contested instrument.

The testimony, some of which is indicated in the summary quoted before from the opinion of the chancellor touching Thomas M. Johnson's connection with the preparations for and execution of the will of Mrs. Johnson, is to the effect that she, without suggestion of any kind from him, or any one else, for that matter, told the husband to see Mr. Mallory and have him draw her will leaving her property to him, her husband; that he, in response, told her that, since she was going to do as stated, he would make his will in her favor, and suggested a joint will; that she adopted the suggestion of a joint will, and instructed him to have Mr. Mallory draw a joint will; that the husband saw Mr. Mallory, stated the request of Mrs. Johnson to him, and he advised separate wills; that he (the husband) communicated Mr. Mallory's advice to Mrs. Johnson, and she directed him (the husband) to have Mr. Mallory draw the separate wills;

that this was done, the husband taking the papers from Mr. Mallory and later paying the fee for the service which the attorney had charged to him; that he (the husband) carried them home on the date of execution and put them in a desk in the room of Mrs. Johnson and himself; that, at the request of Mrs. Johnson, Miss Ford got her will out of the desk and handed it to her, Mrs. Johnson thereupon reading it; that while this reading was in progress Henry B. Johnson came in, and, after completing the reading, Mrs. Johnson handed it to Henry B. Johnson to read; that, after he had read it, Mrs. Johnson took the paper and remarked that it was drawn as directed by her, and, handing it to Miss Ford, told her to put it back in the desk; that Dr. Dubose later came in, whereupon Mrs. Johnson expressed her pleasure he had come, and asked him to witness her will, and directed Miss Ford to get it; that Dr. Dubose asked her if it was her will, to which she replied that it was; that Mrs. Johnson then signed it by mark, being unable to write on account of swollen arm; that Dr. Dubose, Miss Ford, and Henry M. Johnson then, in her presence and at her previously expressed request, attested the instrument; that Mrs. Johnson asked Miss Ford that she not mention the execution of the will, and when another person came into the roor, and about the time the execution was being begun, Mrs. Johnson had the paper put away until the person had left; that the husband was present on the occasion of the execution of the instrument, but took no part in it; that he the next day took the two wills from the desk where they had been placed and put them in his safe; and that he made no mention of the fact of the execution of the instruments to the relations of Mrs. Johnson.  There is no testimony in the record tending to establish a conspiracy between Thomas M. Johnson and any other person or persons whereby

Thomas M. Johnson's conduct and acts as fully stated in the summary above are colorable or affected. We have then, in this record, the question: Do these facts —these acts, as described—show such activity as casts the burden on Thomas M. Johnson to rebut the presumption alleged to have arisen?

In my opinion the testimony in the cause clearly shows that Thomas M. Johnson acted only under the directions and instructions of his wife, supplying, of his motion, not even a suggestion from the beginning to the end, except that of a joint will following and conditioned in suggestion upon the clearly expressed purpose and desire of Mrs. Johnson. The activity that effects to cast the burden on the beneficiary, confidentially relationed, can never be an activity solely referable to a compliance with or obedience to the free and voluntary instructions or directions of the testator. This is the view announced in *Eastis v. Montgomery,* 95 Ala. 493, 11 South. 206, 36 Am. St. Rep. 227: "There is no evidence in this record of any activity on the part of Jonathan Montgomery in and about the preparation and execution of the will, except such as was the result of the wishes and requests of the testatrix, which, so far as the evidence discloses, were entertained and expressed by her of her own free will, and not themselves induced by any undue influence. Such activity, not of proponent's own motion or prompted by personal motives, but in behalf of the testatrix and in furtherance of her purposes, will not combine with confidential relations to shift the burden of proof as to undue influence upon the proponent." This principle was affirmatively recognized in *Garrett v. Heflin,* 98 Ala. 615, 13 South. 326, 39 Am. St. Rep .89; but in that case the confidentially relationed person was held, under the facts there present, to have been so active as to merit the imposition of the burden.

[Mullen v. Johnson, et al.]

There is no evidence in the cause that Thomas M. Johnson excluded persons from the room on the occasion the paper was executed. On the contrary, the proof shows without dispute that it was Mrs. Johnson who acted upon, and desired and so expressed it, that her action in making the will should not be known to her relatives. It was she who had the paper put away until the relative had gone out of the room. It was she who asked Miss Ford to not mention the fact. Surely the observance of these wishes by her husband should not avail to cast the onus on him, who merely respected the desire of the woman whose will was involved. There is no rule of law requiring one to speak, under such circumstances, under penalty for his silence. That Thomas M. Johnson did or did not entertain unkind feelings for the relatives of his wife is not, as appears from this record, any just reason to impute to him acts or conduct in defeat of his wife's undoubted desire for the disposition of her estate, nor, indeed, to so color the circumstance surrounding the execution of the instrument as to ascribe to him the exclusion of persons on the occasion, when no such act or conduct by him is in any wise shown.

The decree below is affirmed.

HARALSON, DOWDELL, SIMPSON, ANDERSON, and DENSON, JJ., concur.

TYSON, C. J. (dissenting). In this case it is clearly established that the appellee, a young, strong, and healthy man, not shown to be possessed of any estate, with a wife feeble and sick unto death with a painful and mortal disease, and constantly under the influence of narcotics, by personal negotiation, with or without the assistance of a brother, who was much in control, made an agreement with his wife, who was childless and possessed of considerable wealth, to make mutual wills

each giving to the other all of his or her estate, and that he gave sole directions for the preparation of the will of his wife by his attorney, making him her sole devisee and legatee, and had the will executed at 9 o'clock at night, in the absence of the members of her family, some of whom lived in the same house with her and assisted in caring for her, and kept its execution a secret as long as she lived, not disclosing the fact of its execution until some time after her death. There is much uncontradicted evidence of the uniform fondness of the wife for her blood relations, and of declarations by her of an intention to leave her property in whole or in part to them. There is also much evidence in the case, and other evidence which was in some instances improperly excluded, tending to show in a marked degree the mental incapacity of the wife, on the date of the execution of the instrument, to make a will. This evidence tending to show want of mental capacity, however, is opposed by other testimony tending to show a sound and disposing mind in the deceased. There is no dispute, however, that the testatrix was in a weak and feeble physical condition, and was practically confined to her bed and in the care of hired nurses, and constantly taking morphine, which facts, it is common knowledge, subdue and weaken more or less the will power and independence of the mind.

Under these well-proved and undisputed circumstances, the husband, commanding from his relation the very citadel of influence over the wife, conceived and carried through by his own acts and interference the scheme of mutual wills, under which his feeble and death-stricken wife makes him her executor and sole devisee and legatee. He must have known that in a short time the gift of all his estate to his wife would be a lapsed legacy, on account of the death of the beneficiary during his life; and, if the transaction be sought to be sustained upon

[Mullen v. Johnson, et al.]

the idea of a contract inter vivos, it might well be stricken down upon the ground of fraud, being nothing more than a catching bargain, indicating fraud upon its face. This feature, however, should be disregarded, and the instrument purporting to be the will of the wife considered as a single act, by which she makes the husband the exclusive recipient of all her estate under the circumstances above detailed. There is no question of the right of a wife to give all her property to her husband, nor does the law regard such an act with the least suspicion or aversion. But the very sine qui non of valid testamentary disposition is the exercise of a free and untrammeled will in the execution of the instrument evidencing the gift; and to avoid the possibility of fraud, in cases when generally it is impossible of being affirmatively shown, the rule of law is firmly established that when a person standing in confidential relations to another becomes by testamentary disposition the donee of that person's property, and is shown to have been active in procuring the execution of the will, if not in dictating its entire conception and terms, the burden is upon him to show affirmatively and clearly, to the satisfaction of the court trying the issue, a complete severance of the relation at the time of the execution of the will. This is commonly done, and we do not see how it could well otherwise be done, by showing that the donee had the benefit of competent and independent advice prior to and in contemplation of the execution of the will. Our decisions are very full and direct to this point.— *McQueen v. Wilson,* 131 Ala. 606, 31 South. 94; *Coghill v. Kennedy,* 119 Ala. 658, 24 South. 459; *Bancroft v. Otis,* 91 Ala. 279, 8 South. 286, 24 Am. St. Rep. 904; *Noble's Adm'r v. Moses,* 81 Ala. 540, 1 South. 217, 60 Am. Rep. 175; *Harraway v. Harraway,* 136 Ala. 499, 34 South. 836. See, also, 2 Pom. Eq. § 960.

In this case there was no severance of the relation shown, or that the wife had the benefit of competent and independent advice; and in the absence of such proof the presumption of undue influence has not been overcome, arising from the husband's activity in procuring the execution of the will.  In the opinion of the writer, the paper purporting to be a will should have been declared by the chancellor to be null and void, and the probate of it as a will by the probate court should have been vacated as prayed.  The other members of the court, however, entertain the opinion that the chancellor's decree was correct, and therefore should be affirmed.