# Watkins *v.* Yeatman.

## *Will Contest.*

(Decided November 7, 1914. 66 South. 707.)

1. *Wills; Testamentary Capacity; Requisites.*—The law only re-quires that a testator shall have mind and memory sufficient to recall the property he is about to bequeath, the object of his bounty, the disposition he wishes to make—to know and understand the nature and consequences of the business to be performed, and to discern the simple and obvious relation of its elements to each other; hence, the fact that at the time of executing his will, the testator by reason of sickness, old age, or as the result of a too frequent use of intoxi-cants, was reduced in intellectual vigor, and his mind reduced below normal, did not imply necessarily that he was lacking in testament-ary capacity.

2. *Same.*—Mere weakness of intellect is not sufficient to incapaci-tate a person to make a will, nor will delusion or partial insanity invalidate a will which is not the offspring thereof.

3. *Same; Evidence.*—The evidence examined and held not suffi-cient to authorize a verdict finding that the testator had not testa-mentary capacity at the time he executed the will in question.

4. *Same; Probate; Verdict; Review.*—A verdict finding the testa-tor had not testamentary capacity, will be set aside on appeal where the appellate court is convinced that the preponderance of the evi-dence against the verdict is so decided as to show that it was improper and unjust.

APPEAL from Madison Probate Court.

Heard before Hon. W. T. LAWLER.

Petition by William H. Watkins to probate the will of D. P. Yeatman, with contest by J. R. Yeatman,

From a judgment refusing probate, proponent appeals. Reversed and remanded.

Douglass Taylor, for appellant.

Betts & Betts, for appellee.

De Graffenried, J.—D. P. Yeatman died in Madison county and owned real and personal property situated therein. He had one brother, J. R. Yeatman, of the whole blood, and one brother, W. H. Watkins, of the half blood. They were his only heirs and next of kin.

While the evidence is not full on the subject, we gather that these two brothers had a full sister, Miss Jennie Yeatman, who never married, and that their father died many years ago; that, after the death of the father, the mother of these three children married one Watkins, and that she bore him one son, W. H. Watkins; that, after the birth of W. H. Watkins (how long after his birth we do not know), the second husband (the stepfather of these three children of the full blood) died; and that after his death these two brothers of the whole blood and their sister and the half-brother (W. H. Watkins) continued to live together with their mother, in the same home, until the said J. R. Yeatman married and set up a separate home for himself. We also gather from the evidence that after the marriage of said J. R. Yeatman (we gather from the record that his marriage occurred many years ago) the said D. P. Yeatman and his sister, Jennie, and the half-brother, W. H. Watkins, continued to live together, in the same home, with their mother until she died; that after her death the said D. P. Yeatman and the sister and the said half-brother of the half blood, W.

H. Watkins, continued to live in the same home until the sister died; and that, after the death of the sister, the said D. P. Yeatman and his said half-brother continued to live together in the same home, and probably in the same room, until September, 1911, when the home was rented out and the said D. P. Yeatman became a boarder with his tenant. D. P. Yeatman died in April, 1912, and upon his death it was found that he had left behind him a paper which purported to be his last will and testament, and that by said will he had bequeathed his diamond ring to his niece (a daughter of the brother of the whole blood), and had devised and bequeathed all of the balance of his estate of all sorts to his said half-brother as his sole executor, with directions that no bond should be required of him as such executor.

D. P. Yeatman (and he never married) was 52 years old when he died. W. H. Watkins the half-brother, is evidently a young man not over 30. D. P. Yeatman was therefore a grown man, or about grown, when this half-brother came into his life, and he and this half-brother seem to have always lived together. The jury had the right to find that growng out of the disparity in the ages of these two people, and their long and intimate relations with each other, there was established between them those ties of affection and sympathy which blood relationship and long-continued intimacy usually fix in human lives. The will was therefore, in so far as the evidence in this record is concerned, not unnatural. The bequest of the diamond ring to the niece was a fitting recognition of her womanly claim to an ornament which a young lady would be expected to prize, and the devise and bequest of the residue of the property to the half-brother was that disposition, in so far as the evidence in this record indi-

[Watkins v. Yeatman.]

cates, which would not unnaturally follow an intimate daily association which had been unbroken from the birth of the half-brother to the death of the testator. True, a full brother was left unprovided for, but to use the language of appellant's counsel in his brief:

"J. R. Yeatman had married many years ago, and he and his family lived separate from the rest. For many years prior to his death, Mrs. Watkins, Miss Jennie Yeatman, D. P. Yeatman, and W. H. Watkins lived together as one household. After the death of Mrs. Watkins the other three continued to live together until the death of the sister. After the death of the sister D. P. Yeatman and W. H. Watkins continued to room together until the house was rented in September before the death of D. P. Yeatman. The whole course of the lives of the testator and proponent drew them together. Both were unmarried. They lived in the same household all of Watkins' life. Watkins was many years younger than Yeatman, and had no father, and there is nothing unnatural in view of their lives that D. P. Yeatman should have developed the strong affection he had for his brother. On the other hand, the course of the lives of the two brothers of the full blood were away from each other instead of towards each other. J. R. Yeatman married, had a home and family of his own, which, in a sense, made him independent of the others for affection and association, while the single ones had no one but themselves, and consequently clung all the closer to each other. It was just such a situation as we see every day, and, in following the dictates of his affection in the distribution of his property, the testator made such a will as was natural."

In other words, while a full brother was in this will left unprovided for, and while there is much in the

adage that "blood is thicker than water," the chief ben-
ificiary under the present will, and the testator had in
their veins the blood of the same mother, and the ties
which knit them together were home ties—ties which
were linked by the associations under the same roof
and around the same fireside. Such ties are usually
not disregarded.

We have been led to make the above remarks because,
while the will which is involved in this controversy
was executed by the testator when he was in close prox-
imity to the end of his days and was possessed of a
body which was tottering with disease, his will should
not be invalidated on that single account. To use the
thought and, in most part, the language of Chancellor
Kent: "The control which the law still gives to a man
over the disposal of his property is one of the most
efficient means which he has in protracted life, to com-
mand the attention due to his infirmities."

The will of such a man "ought to be regarded with
great tenderness, when it appears not to have been pro-
cured by fraudulent arts, but contains those very dis-
positions which the circumstances of his situation and
the course of the natural affections dictate."—*Van
Alst v. Huner*, 5 Johns. Ch. (N. Y.) 148.

While, in this case, the testator was only 52 years
old, there was evidence tending to show that from
Bright's disease, superinduced by the too free and fre-
quent use of intoxicants, he was prematurely old, and
that, when he made the will in question, he was suf-
fering from that weakness of body and mind which
not infrequently accompanies those who are in fact
much older, and that this will comes, on that account,
within the reason of the above rule.—*Leeper, Ex'r, v.
Taylor et al.*, 47 Ala. 221.

1. The probate of the above will was contested by the full brother, J. R. Yeatman, upon the following grounds: "(1) Said will was not duly executed in this: That it was not signed by the testator or some person in his presence, and by his direction, and attested by at least two witnesses, who subscribed their names thereto in the presence of the testator.

"(2) At the date of the execution of said will, the mind of the testator was unsound to such an extent as to render him incapable of making a valid will.

"(3) At the time of the execution of said supposed will, the said D. P. Yeatman was not of sound mind and disposing memory, wherefore said will is not his last will and testament.

"(4) At the date of the execution of said will, the said D. P. Yeatman's mind had become so far impaired by the continued and excessive use, for a long period, of drugs, stimulants, and intoxicants as to render him mentally incapable of making a valid will.

"(5) Said will was procured to be executed by the proponent, W. H. Watkins, by and through undue influence exerted by him over the deceased, who had become mentally and physically feeble, through the long and continued use of intoxicating stimulants and hurtful drugs."

2. The principal question which was presented, upon the trial of the issues formed by the above grounds of contest, was as to the mental capacity of the testator, at the time he signed the will, to make a testamentary disposition of his property. In this connection we desire to say that the mere fact that a man is, by reason of sickness, old age, or as a result of the too free use of intoxicants, reduced in intellectual vigor, and that his mind, on either or all of the above accounts, is, at the time he executes his will, merely below its normal

standard, does not, by any means, necessarily imply that he is lacking in testamentary capacity. All that the law requires is that the testator shall have "mind and memory sufficient to recall and remember the property he is about to bequeath, the objects of his bounty, the disposition that he wishes to make, to know and understand the nature and consequences of the business to be performed, and to discern the simple and obvious relations of its elements to each other—*Kramer v. Weinert,* 81 Ala. 414, 1 South. 26.

"Mere weakness of intellect is not sufficient to incapacitate. Delusion or partial insanity will not invalidate a will, which is not the offspring of such delusion or partial insanity." And a rule which would make a capacity to manage and transact business generally the standard of testamentary capacity was repudiated in *Stubbs v. Houston,* 33 Ala. 555. "There may be a competency to make a will, without such capacity as would enable a man to transact the ordinary business of life. Feebleness of intellect, or the childishness and fretfulness of old age, not amounting to mental unsoundness, might make one unfit for the active business transactions of life, which would require prompt action upon newly presented subjects, with combinations to which the mind was unaccustomed; and yet there might be a full capacity to make a will." The rule which would make a capacity for the management and transaction of business generally the standard of testamentary capacity is repudiated in *Kinne v. Kinne,* 9 Conn. 102, 21 Am. Dec. 732, and *Harrison v. Rowan,* 3 Wash. C. C. 586, Fed. Cas. No. 6,141.

In the instant case we are not dealing with a case so much of mental derangement as of alleged mental degeneracy. We are dealing with a case in which mental degeneracy, due to the excessive use of alcoholic

[Watkins v. Yeatman.]

stimulants and to the effect of chronic Bright's disease, is claimed to be the reason why the testator did not possess testamentary capacity. It is admitted by all the parties that the testator, until a few months before the making of the will, possessed testamentary capacity. It is not claimed that the testator became mad, but that, from intemperance and the above disease, the mind of the testator became so imbecile, unstable, and uncertain as that he was incapable of knowing and appreciating the nature, effect, and consequences of his act when he made his will. The true rules of the common law (and our courts have adopted them) on the particular subject now in hand are stated in *Slaughter v. Heath,* 127 Ga. 747, 51 S. E. 69, 27 L. R. A. (N. S.) 1, substantially as follows: "However old, feeble, weak-minded, capricious, notionate he may be, if he 'be able to have a decided and rational desire as to the disposition of his property,' he is not wanting in testamentary capacity. And, in making the inquiry, * * * attention is to be given, not so much to the state of the mind [of the person] as an abstract philosophical or medical question, as to its capacity for the precise thing in hand. * * * His desire must be decided, in distinction from the wavering, vacillating fancies of a distempered intellect. It must be rational, in distinction from the ravings of a madman, the silly pratings of an idiot, the childish whims of imbecility, or the excited vagaries of a drunkard."

We have carefully selected the above quotation from sentences which appear in the above case because they succinctly express the law of this state as it has always been declared by our courts to exist.—*Couch v. Couch,* 7 Ala. 518, 42 Am. Dec. 602; *Roberts v. Trawick,* 13 Ala. 83; *Hughes v. Hughes Ex'r,* 31 Ala. 524; *Stubbs v. Houston,* 33 Ala. 564; *Leeper v. Taylor,* 47

Ala. 224; *Schieffelin v. Schieffelin*, 127 Ala. 14, 28 South. 687; *Taylor v. Kelly*, 31 Ala. 59, 68 Am. Dec. 160; *Eastes v. Montgomery*, 95 Ala. 486, 11 South. 204, 36 Am. St. Rep. 227; *Knox v. Knox*, 95 Ala. 495, 11 South. 125, 36 Am. St. Rep. 235; *Bulger v. Ross*, 98 Ala. 267, 12 South. 803; *Mullen v. Johnson*, 157 Ala. 262, 47 South. 584; *Kramer v. Weinert*, 81 Ala. 414, 1 South. 26; *Burney v. Torrey*, 100 Ala. 157, 14 South. 685, 46 Am. St. Rep. 33; *Torrey v. Burney*, 113 Ala. 496, 21 South. 348; *Council v. Mayhew*, 172 Ala. 295, 55 South. 314.

Under our law a man who is possessed of the above capacity has a right to say, by his will, what shall become of his property after his death, and the above rule, in furtherance of the wise policy of the law on the subject, should be kept in steady view by our courts, for, to use the language of Judge Cooley, in *Fraser v. Jennison*, 42 Mich. 227, 3 N. W. 897: "As disturbing causes may be discovered in the family or personal history of almost every living person, the general result is that occasion is found for contesting the validity of almost every will, especially if the estate is sufficient to tempt the endeavor. Was the decedent afflicted with a loathesome disease? Then this presumably affected his mental health. Were his ambitious hopes disappointed? Then his reason must have given away. Did a brother have fits? Then there must have been insanity in some ancestor which has tainted the brain of all descendants. Has the only son gone to ruin? Then he must have inherited mental weakness from his father, and his bad conduct has probably reacted upon the father and disturbed his reason. Did the deceased have ways differing from most men, and rendering him eccentric? Then surely, as most men are sane, he must have been insane. Has he failed to

remember some nurse or some cousin in the distribution of his bounty? Then behold, in ingratitude and want of family affection, the plain indication of mental disorder. But we need not pursue the list. Give free admission to such evidence, and no man can feel assured that the jury which examines his will in the light of his family history and personal peculiarities will not adjudge him a madman."

This court, in recognition of the fact that, when upon the issue devisavit vel non, the question as to the testamentary capacity of the testator is involved, a wide range must be given to the testimony, and that the law itself (on account of the poverty or inability of the language in all its fullness to at all times convey full meaning) finds difficulty in defining the line which separates imbecility or legal mental unfitness to make a will from legal testamentary capacity, has refused to be guided by the mere opinion of witnesses, provided the actual facts testified to by all the witnesses, if true, clearly and satisfactorily show that the testator, when he signed the will, possessed what the law declares to be testamentary capacity.—*Leeper, Ex'r, ets., v. Taylor and Wife, supra.*

In the above case (and that case has not only never been criticised as to its utterance on the subject now under consideration, but it cannot be because those utterances are founded upon the best of reason, common sense, and common right) this court said: "The testimony here very clearly shows that Dr. Gantt very well knew what he was about when he made and published the instrument propounded for probate as his will; he was the sole author of it; and that it proceeded from his own and from no other mind. Such facts are entitled to overpower the mere conjectures of the witnesses who testified that they believed his mind to have.

been unsound.—*Couch v. Couch*, 7 Ala. 519, 42 Am.
Dec. 602.  *  *  * In every sense, the testament
shows such a disposition of the testator's estate as con-
forms to the intelligence, character, and tastes of Dr.
Gnatt, who made it, as given by the numerous wit-
nesses, who had best and longest known him. I can-
not therefore free my mind from the apprehension that
the learned judge in the court below mistook the force
of the evidence, which tended to establish impairment
and feebleness of mind, as going to show a higher order
of derangement; that is, statutory unsoundness and in-
sanity." .

In the instant case the evidence of the scrivener who
prepared the will tends strongly to show, if his tes-
timony is true, that the will was the deliberate act of
his mind. The evidence of the two witnesses who at-
tested the will, if true, also strongly tends to estab-
lish the same fact. The evidence also shows that, when
the will was executed, the testator was attending to
his ordinary accustomed business. The evidence of the
physician who attended him during his last illness can-
not be distorted into indicating that on March 15th,
the day on which the will was signed and published,
Mr. Yeatman was not then of a disposing mind and
memory. Neither the testimony of this physician nor
that of Dr. J. L. Darwin, when carefully weighed and
reasonably considered, can be accepted as indicating
that on March 15th, more than three weeks before the
death of the testator, the testator was then in such a
state of mental imbecility as to be incapable of mak-
ing a will. Indeed, if, instead of signing and publish-
ing a will, the testator had killed a human being, and
in doing so had indicated that same degree of delib-
eration and fixity of purpose which was evidenced by
him in this matter, he could hardly have escaped the

[Watkins v. Yeatman.]

heavy penalty of the law against the deliberate murder upon the ground that, at that time, he was in such a state of imbecility as not to know or understand the nature of his act.

A careful and candid examination of the entire testimony convinces us that those who were in the best position to judge of the mental condition of the testator at and near the time when he signed his will were of the opinion that at the time he executed it he was sane; that many of those who testified that in their opinion the testator was mentally unsound had only seen the testator during the time referred to in their testimony at periods when he was drinking; and in their opinion, he was mentally unsound, came to that conclusion because of his inebriety and ill health, coupled with the fact that he had given substantially all of his property to one brother to the exclusion of the other brother. In fact, two of the witnesses expressly said that, if he had been sane when he made his will, they did not believe that he would have "done such a thing."

3. The testator died from Bright's disease. The immediate cause of death was euremic poison. On the 24th day of March (16 days before his death and 9 days after he executed his will) he went to see a physician. He went to this physician of his own volition and submitted himself to an examination at his hands. The testator evidently knew what he was about when he did this. The physician told him to go home and go to bed. The testator did this, and he evidently knew what he was about when he did it. From that time on until his death he gradually grew worse, and before his death lapsed into a comatose condition, from which he occasionally aroused into moments of consciousness or semiconsciousness. The condition of the testator from the time he first saw the physician until

he died was, if the evidence in this record is true, just such a condition as the ordinary layman would expect to find in one who had taken to his bed in the final stages of Bright's disease and who was dying of euremic poison brought on by the disease. Prior to the 24th day of March, the testator was going about the streets of Huntsville in an enfeebled condition. When drinking (and he seems generally during the business hours of the day to have been drinking), his mind was uncertain, inactive, and inefficient. Prior to the execution of his will, he made monthly collection of his rents, and he seems to have known exactly when to make the collections and how to behave himself while collecting them. He kept a bank account with a bank in which he deposited his money as he collected it, and against which account he was accustomed to draw checks as he needed money. He paid his taxes, had no agents to attend to anything for him, and had general control, management, and supervision of his property just as all sane people are expected to have. While there were times, to use the language of one of the witnesses, when "he was a little off," no instance is pointed out in all his history where he made an improvident bargain or, in matters of his private business, did any improvident act until he made his will. If, as the scrivener testified, the testator came to him on one day and directed him to prepare his will, and gave him, in detail, the manner in which he wished to dispose of his property, if, on the next day, the testator again came to the scrivener and again, in the same terms as of the preceding day, dictated the terms of his will, if the scrivener then prepared the will as dictated by the testator and then told the testator that it was necessary for him to sign the will in the presence of two witnesses, and that they must sign the will as attest-

ing witnesses in his presence and in the presence of each other, if the testator then took the will away with him and one, two, or three days afterward saw the two subscribing witnesses and told them or either of them what was in the will (how he was disposing of his property), and then signed the will in their presence and in the presence of each other as subscribing witnesses to the will, then, when he executed the will, the testator, by his acts, gave strong evidence of sufficient mental capacity to make a will. If all the opinions of witnesses who testify to the insanity or imbecility of the testator are correct (if they gave their truthful opinions, and if their opinions correctly fix the true status of the testator's mind), then those opinions institute a conflict as to the testamentary capacity of the testator, and for that reason renders it necessary for this case, on the issue now under discussion, to be submitted to the consideration of a jury. If the jury, after considering all the testimony, should conclude that the testimony of the scrivener and the subscribing witnesses is false (if the will was not executed with the intelligence and deliberation indicated by their testimony), then the jury might be able to find that the will should not be probated because of the testamentary incapacity of the testator.

In charging the jury on the subject of testamentary capacity, the law was stated to the jury by the trial court substantially as we have above declared it. The evidence in this case on the subject of the testamentary capacity of the testator was so overwhelmingly in favor of his testamentary capacity at the time he executed his will as to convince us that, in refusing to grant the appellant's motion for a new trial, the trial court committed reversible error.

[Alabama Power Co. v. Carden.]

We are not unmindful of the doctrine which has been so long established by this court with reference to upholding the action of trial courts in refusing to set aside the verdicts of juries (*Cobb v. Malone*, 92 Ala. 630, 9 South. 738), but in this case, after carefully weighing all the evidence on the subject of the testamentary capacity of the testator, coupled with the evidence which may have had some tendency to show undue influence, we are convinced that the preponderance of the evidence against the verdict in this case was so decided as that the verdict was clearly wrong and unjust.

The judgment of the court below is therefore reversed, and the cause is remanded, to the end that the issues presented by the record may be tried by another jury.

Reversed and remanded.

McClellan, Somerville, and Gardner, JJ., concur.