In Re: Estate of Mary A. Donnelly, *deceased.*

GLENN W. GOLD, as Executor of the Last Will and Testament of Mary A. Donnelly, deceased, v. WALTER S. ASHBY, LILLIAN M. GABY, *et vir,* RICHARD ASHBY MARRIOTT, MARTINA M. SMITH, *et vir,* and JOSEPHINE M. KIPP, *et vir.*

188 So. 108.

Opinion Filed July 15, 1938.

Rehearing Denied April 28, 1939.

*Mitchell D. Price* and *Charles W. Zaring* and *Robert S. Florence,* for Appellant;

*Stanley Milledge, Robert G. Gilroy* and *Stockton, Ulmer & Murchison, for Appellees.*

CHAPMAN, *J.*—The transcript herein shows that Honorable W. F. Blanton, County Judge of Dade County, Florida, on November 13, 1934, in full compliance with all statutory requirements, made and entered an order admitting to probate the last will and testament of Mary A. Donnelly, such will being as follows:

"I, MARY A. DONNELLY, of the City of Miami, Dade County, Florida being of sound mind and memory, do hereby make, publish and declare this to be my last Will and Testament; hereby revoking all former Wills, Codicils, or Testamentary Dispositions heretofore made by me.

"FIRST: I order and direct that my Executor, hereinafter named, pay all my just debts and funeral expenses as soon after my decease as conveniently may be, and I hereby order and direct that I be buried in the City Cemetery at Miami, Florida, in the same lot with the late Richard Ashby, and my sister, Margaret Ashby.

"SECOND: I give and bequeath any oriental rugs, table linen, dishes, silver, and clothing which I may possess at the time of my death, together with the sum of Two Thousand and No/100 ($2,000.00) Dollars in cash, to Mrs. Gussie Budge. of 323 N. E. 27th Street, Miami, Florida.

"THIRD: I give and bequeath my oak invalid table and my lady's Mahogany desk, now located at 334 N. E. 22nd Street, Miami, Florida, to J. Winifred Gold of 1219 Lisbon Street, Coral Gables, Florida.

"FOURTH: I give and bequeath all of my jewelry to

Margaret Gold, of Miami, Florida, daughter of the above mentioned J. Winifred Gold.

"FIFTH: I give and bequeath to Mrs. Clara Hunt, of 334 Ann Street, Hartford, Connecticut, the sum of Two Thousand and No/100 ($2,000) Dollars cash.

"SIXTH: All the rest, residue and remainder of my estate, both real and personal, wherever located or in whatever form the same may be, I give, devise and bequeath unto William H. Gold of 1219 Lisbon Street, Coral Gables, Florida, or to his son, Glenn W. Gold, of Miami, Florida, in the event the said William H. Gold should predecease me.

"SEVENTH: I hereby constitute and appoint Glenn W. Gold of Miami, Florida, as Executor of this my Last Will and Testament, and I direct that he serve as such without being required to post or file bond as Executor.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name and affixed my seal, the 15th day of November, in the year of our Lord One Thousand Nine Hundred and Thirty Three.
  "Mary A. Donnelly.   .(SEAL)

"We do hereby certify that on this 15th day of November, A. D. 1933, at Miami, Dade County, Florida, the above named Mary A. Donnelly, to us personally known, being then of sound mind and memory, signed, published and declared the foregoing to be her Last Will and Testament in our presence and we, at her request and in her presence and in the presence of each other, hereunto subscribe our names as witnesses thereto.
  . "C. E. Courtney
  "Edward P. White
  "R. E. Kunkel."

On June 26, 1935, a petition for revocation of the probation of the will, *supra,* was filed in the County Judge's Court of Dade County, Florida, on the part of Walter S. Ashby,

Lillian M. Gaby, Richard Ashby Marriott, and Martina M. Smith, against William H. Gold, Glenn W. Gold, J. Winifred Gold, Mrs. Gussie Budge, and Mrs. Clara Hunt. The petition seeing a revocation of the will alleged, among other things, that at the time of the execution of the will by Mary A. Donnelly on November 15, 1933, a confidential relationship existed between William H. Gold and the testator; that William H. Gold actively procured and participated directly and indirectly in the preparation and execution of the will of Mary A. Donnelly and in which William H. Gold was the chief beneficiary; also; (a) Mary A. Donnelly lacked testamentary capacity; and (b) Mary A. Donnelly was unduly influenced by William H. Gold. The respondents answered and denied each and every the material allegations of the petition.

Considerable testimony was taken before the Honorable W. F. Blanton, and after hearing counsel for the respective parties, on March 23, 1937, made and entered an order overruling and denying the petition for the revocation of the order admitting to probate the Will of Mary A. Donnelly. The material portions of his said order are, viz.:

"The Court finds that William H. Gold was the chief beneficiary under the said will of Mary A. Donnelly, dated November 15, 1933, and that except for the execution thereof he would not have been a beneficiary of the Estate of said Mary A. Donnelly; that the evidence adduced by the Petitioners made out a *prima facie* case of undue influence; and raised the presumption of undue influence being exerted by said William H. Gold over said Mary A. Donnelly in the preparation and execution of her said will. And that, therefore, by reason of said presumption, the burden of proof shifted from the contestants, or petitioners, to the respondent, or proponent, of said will to adduce sufficient testimony to at least equalize or overcome the presumption of undue

influence and *prima facie* case made out by the contestants, or petitioners.

"The Court finds that the respondent, chief beneficiary under said will, has adduced sufficient testimony to equalize, if not overcome, the testimony, presumption of undue influence, and *prima facie* case made by the contestants, or petitioners, and that from all of the testimony submitted the Court cannot say that the said will of Mary A. Donnelly, dated November 15, 1933, was the result of undue influence."

The contestants, viz., Walter S. Ashby, Lillian M. Gaby, Martina Smith and Josephine Marroitt Kipp took an appeal from the order aforesaid to the Circuit Court of Dade County, Florida, when an order of reversal was entered on May 28, 1937, and in so doing said:

"* * * Richard Ashby was the father of Walter S. Ashby and Lillian Gaby, and the grandfather of Martina M. Smith and Josephine Marriott Kipp, the petitioners herein. Richard Ashby was married three times. By the first wife he had all of his children. His second wife was the sister of Mary Donnelly. His third wife died before the matters involved herein had transpired. From the time Richard Ashby married her sister, Mary Donnelly had made her home with the Ashbys. After her sister died she continued managing the home the same as she had while her sister lived and continued doing this during the life of his third wife.

"For about forty years she lived in the same house with Richard Ashby and ministered to his wants. She was a lone woman without relatives of her own. She worked in the Ashby home without stated compensation, and in recognition of her services to him, in 1924 Richard Ashby set up a trust to provide her a home and $250.00 a month so long as she lived. During this time, friendly relations existed

between Mary Donnelly and the other members of the Ashby family, and Mary Donnelly made her will giving all she had to Richard Ashby, or if he predeceased her, to his estate.

"In 1924 when Richard Ashby created the trust for Miss Donnelly he was transacting all his business through First Trust & Savings Bank, but in 1927 he took his business to W. H. Gold. In 1931 Mary Donnelly also began having Gold look after her investments. In October 1932, Walter S. Ashby came to Miami with his family and took up his residence at his father's home. Shortly after that, Lillian M. Gaby came to Miami with her family and took up her residence at her father's home. In February 1933 Walter S. Ashby and Lillian M. Gaby procured severeal other persons to petition the lower court to adjudge their father insane, and on March 1, 1933, Richard S. Ashby was adjudicated insane. Two days later the lower court appointed Walter S. Ashby and Lillian M. Gaby guardians of their father and of his estate.

"The guardians promptly demanded of W. H. Gold all of Richard Ashby's assets in his possession including the securities and mortgages Richard Ashby set aside for Mary Donnelly in 1932 to provide her with additional income, which securities were for some reason in the possession of W. H. Gold. Gold refused to comply with their request, but instead delivered these assets to the County Judge's Court, and upon advice of, counsel recorded the Assignment of the Mortgages that had been turned over to Miss Donnelly, whereupon the petitioners filed suit in the Circuit Court against Gold and Miss Dennelly to compel delivery of all these assets to petitioners.

"This suit was terminated by a final decree of court agreed to by the parties and a release executed by Mary Donnelly. By the final decree the '1932 trust' was termi-

nated, and in lieu thereof she received the Magnant mortgage for $6,200.00, which had then been in default of two or more years, and $1,300.00 in cash. In July 1933 Richard Ashby died.

"It appears that the '1932 trust' for Mary Donnelly was procured by W. H. Gold from Richard Ashby and that he held the trust *res* in his possession. The evidence does not show that the securities for this '1932 trust' in the hands of Gold was handled with much formality. The trust instrument appears to be a letter of precatory nature signed by Richard Ashby addressed to W. H. Gold. It appears however, that Gold held the securities, which were not inconsequential in value. Possibly he gave Ashby a receipt. Maybe he gave Miss Donnelly a receipt. The securities appear to have been in his name 'as trustee.'

"Regardless of other matters it appears that W. H. Gold has had experience with the matter of other people's will and is not engaged in the practice of law. These particular wills seem to be those of elderly people. He testifies he had drawn four or five such wills and his attorney testifies that he (the attorney) drew such named wills. I take it that they were both right. They drew them together. I likewise take it that Miss Donnelly's will was likewise drawn by them both. Gold drew it for Miss Donnelly and the attorney was accommodating Gold. The attorney was usually paid for such services by 'other business' from Gold, but Gold paid him for drawing Miss Donnelly's will—but after her death. He at this time did not neglect the attorney nor did he wait to compensate him with other business. The will was now to take effect—to be probated. It was to take life and speak for the dead, and the Golds were beneficiaries.

"It is evident that Richard Ashby as he grew older grew weaker in mind and body and depended more on Gold who

466

was his advisor; that Gold in turn became the trusted friend of Mary Donnelly; hence the '1932 trust' for Mary Donnelly. When Richard Ashby was proceeded against by his children because of senile dementia, and then when Mary Donnelly and Gold were sued jointly, Gold was solicitous of Miss Donnelly's welfare. They were defendants together. They settled the suit against them by Ashby's guardians on April 29, 1933.

"On October 30, 1933, Gold wrote Miss Donnelly a masterpiece of a letter. He wrote her about a matter that was of the most private personal nature—about a matter that was to speak for Miss Donnelly after she was dead, at a time when she could not expect to live much longer. He must have known her well or he would not have written her about this exclusive private personal matter—he a real estate broker and money lender. He offered to do something for her that was of a professional nature yet without charge, and furthermore to secure for her recognized professional scrutiny. He was experienced, for he had done it for many others. He proved it; he sent by his daughter a copy of a will drawn for an old lady of 85. It was easy and it worked, with the result that the services were rendered as promised and thereby the will was for the benefit of two devoted beneficent friends to the extent of $2000 each, with Mrs. Gold and Miss Gold receiving only tokens of friendship as evidenced by jewelry and W. H. Gold only taking the residue and remainder of the estate, and the son only acting as executor.

"From the foregoing facts and other facts appearing by the record, it appears that W. H. Gold brought himself into favor of Miss Donnelly by sedulous and servile attention to the art of pleasing this elderly maiden lady; that the relationship between W. H. Gold and Miss Donnelly was such in relation to the will heretofore admitted to probate as to

give rise to a presumption of undue influence of procuring the making of himself a beneficiary which has not been overcome or met by the proof.

"IT IS ORDERED that a decree of reversal upon the appeal be entered accordingly."

From the decree as entered by the Circuit Court of Dade County, Florida, William H. Gold has perfected his appeal here and through counsel presents four questions for decision.

1st. Was the relation between William H. Gold and Mary A. Donnelly of such a confidential character as to give him domination over her?

2nd. Was William H. Gold active in the preparation of the will to such an extent that his activities interfered with or affected the distribution of her estate?

3rd. Did the proponents of the will introduce evidence sufficient to offset any inference or presumption of undue influence that might arise from these facts?

4th. If undue influence is presumed against William H. Gold because of his confidential relation and his activities with respect to the will, does this unfavorable presumption extend to other legatees not in confidential relations with testatrix and who had nothing to do with the preparation or execution of the will?

While counsel for the appellees in their briefs discuss (a) evidence to sustain findings of undue influence; (b) presumption of undue influence; (c) the law of undue influence; and (e) the legal effect of undue influence; it is possible that the several assignments discussed in the briefs can be considered under the single question: From the law applicable to the case at bar and from the evidence adduced by the respective parties, was the chancellor below authorized to make and enter the decree appealed from?

Section 9 of Chapter 16103, Acts of 1933, commonly referred to as the "Probate Act" provides that a will is void if the execution thereof is procured by fraud, duress, mistake, menace, or any undue influence. Likewise, any part of a will is void if so procured, but the remainder of the will not so procured shall be valid, if the same be not invalid for other reasons. The will here is dated November 15, 1933.

This Court has had before it on many occasions the question of "undue influence" as it applies to wills. In the case of Estate of Clara R. Starr v. Wilson, 125 Fla. 536, text pages 543-4, 170 So. 620, when treating this subject, said:

"To authorize a court to deny or revoke the probate of a will on the ground of undue influence there must be active use of such undue influence for the *purpose of securing the execution of the will,* to such an extent as to coerce the mind of the testator, so that it cannot be said that the testator was acting voluntarily, of his or her own free will and volition. Confidential relations between the testator in his lifetime and the legatee who offers the will for probate are not alone sufficient to raise a presumption of undue influence and cast the burden of proof upon the proponent in that regard. Bancroft v. Otis, 91 Ala. 279, 8 So. 286.

"In the case of Newman v. Smith, 82 So. 236, 77 Fla. 633, 667, 668, this Court stated: 'Undue influence comprehends over persuasion, coercion or force that destroys or hampers the free agency and will power of the testator. Mere affection or attachment or a desire to gratify the wishes of one beloved, respected, and trusted, may not, of itself, amount to undue influence affecting the testamentary capacity of a testator.'

"In Peacock v. DuBois, 105 So. 321, 90 Fla. 162: 'To constitute undue influence the mind must be so controlled or affected by persuasion or pressure, artful or fraudulent

contrivances, or by the insidious influences of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but subject to the will or purpose of another.'

" 'The rule seems to be well settled that undue influence, justifying the setting aside of will, deed, or other contract, must be such as to dethrone the free agency of the person making it and rendering his act the produce of the will of another instead of his own.' " (Emphasis supplied.)

In Peacock v. DuBois, 90 Fla. 162, text 164-6, 105 So. 321, this court said:

"Does the testimony show fraud and undue influence? Fraud and undue influence are not strictly speaking synonymous, although undue influence has been classified as either a species of fraud or a kind of duress and in either instance it is treated as fraud or a kind of duress and in either instance it is treated as fraud in general. Heath v. Capital Savings Bank and Trust Co., 79 Vt. 301, 64 Atl. 1127; Cooper v. Harlow, 163 Mich. 210, 128 N. W. 259; Grove v. Spixer, 72 Md. 300, 20 Atl. 144; Frust v. Green, 86 Md. 494, 39 Atl. 863, 866.

"In Howard v. Farr, 115 Minn. 86, 131 N. W. 1071, the court said: To constitute 'undue influence,' the mind must be so controlled or affected by persuasion or pressure, artful or fraudulent contrivances, or by the insidious influences of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but subject to the will or purpose of another.

"In Myatt v. Myatt, 149 N. C. 137, 62 S. E. 887, the court said that: To constitute 'undue influence,' it is unnecessary that moral turpitude or improper motive should exist, and if one, from the best of motives, having obtained a dominant influence over a grantor's mind, induces him to execute a deed or other instrument materially affecting

his rights, which he would not have otherwise executed, so exercising the influence obtained that the grantor's will is effaced or supplanted, the instrument is fraudulent.

"In Prescott v. Johnson, 91 Minn. 273, 97 N. W. 891, the court held that; 'Undue influence,' which will invalidate a gift, 'must be something which destroys the free agency of the donor, and substitutes therefor the will of another. What constitutes such undue influence cannot be precisely defined, and each case must be determined upon the consideration of its special facts. The means employed and extent of the influence are immaterial, if their effect be to destroy the free agency of the donor. The ultimate facts of undue influence may, and in many cases can only be established by circumstantial evidence.'

"The rule seems to be well settled that undue influence justifying the setting aside of the will, deed, or other contract must be such as to dethrone the free agency of the person making it and rendering his act the product of the will of another instead of his own. The character of the transaction, the mental condition of the person whose act is in question, and the relationship of the parties concerned to each other are all elements that may be taken in consideration in applying the rule. Johnson v. Farrell, 215 Ill. 542, 74 N. E. 760; Allday v. Cage (Tex.), 148 S. W. 838; Council v. Mayhew, 172 Ala. 295, 55 So. 314; Mullen v. Johnson, 157 Ala. 262, 47 So. 584; Bust v. Moxom, 157 Mo. App. 342, 138 S. W. 74; Burnett v. Smith, 93 Miss. 566, 47 So. 117; Dingman v. Romine, 141 Mo. 466, 42 S. W. 1087; Franalin v. Belt, 130 Ga. 37, 60 S. E. 146; Francis v. Wilkinson, 147 Ill. 370, 35 N. E. 150; Wilcox v. Wilcox, 165 454, 46 N. E. 369; Marx v. McGlynn, 88 N. Y. 357, 370; DuBois v. Kell, 90 S. C. 196, 71 S. E. 371; Woodville v. Woodville, 63 W. Va. 286, 60 S. E. 140, 144.

"In appeal of Worrall, 110 Pa. 349, 1 Atl. 380, 385, it

was held that where a conveyance was made by a weak and sickly young man to woman older than himself, and who had been to him as a mother, *a presumption arose that such conveyance was obtained by undue influence."* (Emphasis supplied.)

See Gardiner v. Goertner, 110 Fla. 377, 149 So. 186; Theus v. Theus, 119 Fla. 190, 161 So. 76; Newman v. Smith, 77 Fla. 633, 667, 688, 82 So. 236; Hamilton v. Morgan, 93 Fla. 311, 112 So. 80.

Redfearn on Wills and Administration of Estates in Florida at pages 60-62, paragraphs 46, 47 and 48, says:

"46. Undue Influence Defined.—Influence to be undue, so as to invalidate a will, must amount to fear, over-persuasion, force, or coercion to the extent of destroying the free agency and will power of the testator and must be operative on the mind of the testator at the time the will is executed. In such a case, the will does not speak the wishes of the testator but those of the person exercising the undue influence. A will procured through fraud is invalid, but fraud and undue influence are not identical. Fraud defeats the true wishes of the testator by deception, while undue influence subjugates his will and coerces him into acting contrary to his desires. Fraud is practiced through misrepresentations and deceit; while undue influence may sometimes savor of deceit, it may be exerted without any actual fraud's being perpetrated on the testator and without any misrepresentations being made to him.

"47. Undue Influence—Burden of Proof.—When a will is presented for probate, the burden of proof, is upon the proponent to establish *prima facie* the formal execution and attestation of the will. When such proof has been made, the burden shifts to the contestant. A person who attacks a will on the ground that it was procured by undue influence necessarily admits, so far as this issue is concerned, that the

will is otherwise valid. If the will were not otherwise valid, there would be no will to have been procured by undue influence. The burden is on the propounder to prove the formal execution of the will when it is presented for probate; and, when such proof has been made, it is presumed that the testator acted freely and voluntarily in making his will. The burden of proof is on the contestant to prove the undue influence alleged by him.

"48. Proof—Admissibility of Evidence.—A very wide range of testimony is permissible on the issue of undue influence. This is due to the fact that undue influence seldom can be shown except by circumstantial evidence. It results from the circumstances and surroundings of the testator and his associations with the person or persons exercising the undue influence. For this reason it is proper, on this issue, to consider the testator's dealings and associations with the beneficiaries; his habits, motives, feelings; his strength or weakness of character; his confidential, family, social, and business relations; the reasonableness or unreasonableness of the will; his mental and physical condition at the time the will was made; his manner and conduct; and generally every fact which will throw any light on the issue raised by the charge of undue influence."

In Schouler on Wills, Executors and Administrators (6th Ed.) Volume 1, pages 386-7, par. 307, it was said:

"307. Confidential Relations; Participation in Execution of Will. A testator adjudged competent to make a will may be presumed to have known and intended its contents. Hence is it that isolated and disconnected circumstances are not permitted to outweigh the usual presumption of the law that a person of intelligence and capacity who executes a will does so without imposition or undue influence. Thus, the simple fact that the later will modifies an earlier one in favor of one who drew it up is held insufficient to overcome

such a presumption. Or, generally, that the testator's draughtsman, or one whose advice was sought by him, was made executor or receives a legacy under the will.

"In some States confidential relationship alone without showing active participation in drawing a will is insufficient, and the rule in some States goes so far as to hold that the burden remains on the contestant, although the chief beneficiary was in a confidential relation, and also was active at the execution of the will. However, it has been held that where a confidential relation exists between the testator and legatee the activity of the legatee in procuring the will imposes on the proponents the burden of proving that it was not the result of undue influence."

The testimony shows that William H. Gold, his wife Mrs. Gold, and their children, Margaret Gold and Glenn W. Gold, moved to Miami, Florida, from the State of Minnesota, and William H. Gold began the business of a dealer in mortgages and lending money. He had a number of employees in his business and his loans reached as much as $100,000.00 per month. He obtained, when necessary, legal advice from some five or six lawyers at the Miami bar, but the legal services in the case at bar were performed by the firm of Kunkel & White and by Mr. Kunkel of this firm. William H. Gold's firm would make loans for clients with money left with him for the purpose and in 1931 Miss Mary A. Donnelly, a maiden lady above 70 years of age, became one of his clients. She had personal property approximating in value around $15,000.00 to $17,000.00.

Miss Donnelly was a sister-in-law of Richard Ashby. They moved from the State of New York to Miami, Florida, after the death of Mrs. Richard Ashby. Miss Donnelly made her home for many years with her sister, Mrs. Ashby and husband. She was considered as a member of the family and continued to live in the home after her sister's (Mrs.

Ashby) death, where she was a housekeeper and companion to her brother-in-law Richard Ashby. Richard Ashby had accumulated property, as shown by the record, approximating in value some $68,000.00, and it was in liquid form. He made provision for the economic security of Miss Donnelly which amounted to around $250.00 per month. Richard Ashby died when in the late eighties.

Richard Ashby became a client of William H. Gold & Company during the year 1927 at Miami, Florida. He was then well advanced in years. Gold made investments for him and gained his confidence, as shown by the following letter:

"May 31, 1932.

"Mr. William H. Gold,
"Miami, Florida.
"Dear Sir:

"In order to take good care of my sister-in-law, Miss Mary Donnelly, who has been so faithful in attendance on me during many years, it is my desire and wish to provide an additional income over and above that provided in the Trust Agreement now at The First Trust & Savings Bank of Miami, Florida, of about Three Thousand and no/100 ($3,000.00) Dollars per year. This will insure her $500.00 per month as long as she lives.

"To do this, I wish to have you set over and assign to the said Mary Donnelly certain securities, consisting of One Hundred Ninety Five (195) shares of Electric Light Stock, Two Thousand Five Hundred and no/100 ($2,500.00) Dollars electric bond, Two Thousand and no/100 ($2,000.00) Dollars Dodge Bond, and Two Thousand and no/100 ($2,000.00) Dollars Kreuger Toll Bond. At present rate of dividends this would provide about One Thousand Six Hundred and no/100 ($1,600.00) Dollars.·

"In order to take care of the additional amount, I wish to assign to Mary Donnelly three mortgages.

"It is further understood that the income from these stocks, bonds and mortgages, as long as I live shall come to me, and only go to her at the time of my death, and it is further understood and agreed to by Mary Donnelly that at the time of her death, she will make proper provisions so that whatever funds have not been used from the principal amount shall be returned to my heirs in the same proportion as provided for in the Trust Agreement at the First Trust & Savings Bank, of Miami, Florida.

Yours very truly,<br>"RICHARD ASHBY."

The trust formerly placed with the First Trust & Savings Bank was transferred to William H. Gold. Miss Donnelly likewise became a client of William H. Gold & Company during the year 1931. She loved money and believed Gold could make profitable investments for her. Some of the witnesses described her as "pinch penny." In October, 1932, Walter S. Ashby came to Miami and took up his residence with his father, Richard Ashby. It was observed that his father's mind was unsound and the court on March 1, 1933 adjudicated Richard S. Ashby insane and appointed his children, viz.: Walter S. Ashby and Lillian Ashby Gaby, guardians of their father's estate. They immediately demanded of William Gold all property of their father in his possession. Gold refused to deliver the property and suit was filed when possession was surrendered. He had the assignments of the mortgages in favor of Miss Donnelly recorded and there was retained for her the Magnant mortgage for $6,200.00 and $1,300.00 in cash. The final decree restrained Gold from visiting, calling upon, disturbing, or discussing with Richard Ashby the several business transactions. The court denied him attorney's fees and expenses

connected with the said suit. Richard Ashby died shortly after the entry of the final decree, *supra*.

Miss Donnelly had no living relations and continued as a client of William H. Gold, whose daughter visited her daily and administered to her on each trivial request. Gold wrote · her reporting favorable returns from her investments with him. On October 30, 1933, Gold wrote Miss Donnelly as follows:

"WILLIAM H. GOLD COMPANY
1010-11 Security Building,
"Miami, Florida

"October 30, 1933

"Miss· Mary A. Donnelly,
"334 N. E. 22nd Street,
"Miami, Florida.

"Dear Miss Donnelly:

"Mrs. Gold was telling me that you and she discussed the matter of the Will that you have been thinking of for some time. At one time I think you made mention of the fact that you wanted to have an attorney prepare a will for you. If you are still of this mind, we would be very glad to have Mr. R. E. Kunkel meet you here in our office and advise along these lines.

"For your information, I wish to state that Margaret and myself have drawn a number of quite complicated wills right here in our office and have sufficient experience that we would be glad to do the same for you if you wish. I am asking Margaret to stop at your place and talk with you about this and also leave in your possession a copy of one of these wills.

"Mrs. Graves, a lady about 85 years old, whose business we look after entirely. You will note that just recently she made a Codicil to the will. That means that any time you

want to change any will you make, it is a simple matter to make the change, and add it to the original will, or write a new one.

"Not long ago we made up two wills, one for Mr. O. H. Johnson and one for Mrs. Johnson, another for Mr. Campbell, and one for Mrs. Church, our neighbor in Coral Gables. Attorneys usually charge a good substantial figure for drawing these wills. We do it gratis, for our friends, and clients. Occasionally some of them give Margaret a small remuneration.

"All you will need to do is to decide how you want to dispose of the property, then we will map it out, fix it up and turn it over to you and then if you are not quite satisfied, we can call our attorney and get his opinion on it for you.

"Sincerely yours,

"WHG/G                     (Signed) Wm. Gold."
Encl.

On November 15th, 1933, after receiving the letter, *supra,* Miss Donnelly made her will. The attorney drafting the same represented Gold in the suit brought by the children of Richard Ashby. He was paid the sum of $100.00 by Gold after Miss Donnelly's death. His name was stated in the letter, *supra.* The Will as drawn gave Miss Donnelly's property to William Gold, Mrs. Gold, Margaret Gold, while the son Glenn W. Gold was made executor without bond. Mrs. Clara Hunt and Mrs. Gussie Budge, friends of many years, were each given the sum of $2,000.00. She died on November 7, 1934.

When evidence was taken before Honorable W. F. Blanton, County Judge of Dade County, and the court was inquiring into the question of undue influence on Miss Donnelly, William H. Gold was offered as a witness; also his daughter, Margaret Gold, his son, Glenn W. Gold, the at-

torneys for William H. Gold, Mrs. Gussie Budge, a beneficiary, and her husband.

The attending physician of Miss Donnelly, without objection of counsel, gave evidence as to the condition of her mind during the period while she was under his treatment. It appears that the physician and the nurse were the only material witnesses offered having no interest in the property affected by the will. The burden was on the appellant to show that the findings of the order or decree appealed from was erroneous. See: Wang v. First Nat'l Bank, 92 Fla. 974, 110 So. 527; Rundel v. Gordon, 92 Fla. 1110, 111 So. 386; Stevens v. Tampa E. Co., 81 Fla. 512, 88 So. 303; Wood-Hoskins Young Co. v. Taylor Development Co., 98 Fla. 156, 122 So. 224; Howard v. Goodspeed, 101 Fla. 699, 135 So. 294; Foxworth v. Maddox, 137 So. 161, 136 So. 343; 136 So. 506.

This Court has repeatedly held that in equity as in law every presumption is in favor of the correctness of the ruling of the trial court and a decree based largely or solely on questions of fact will not be disturbed unless clearly erroneous. See: Fiser v. Willard, 60 Fla. 395, 53 So. 501; Powell v. Powell, 77 Fla. 181, 81 So. 105; Whidden v. Rogers, 78 Fla. 93, 82 So. 611; Sandlin v. Hunter Company, 70 Fla. 514, 70 So. 553.

It is strongly argued here that Miss Donnelly at the time of making her will was bitter toward the "Ashby tribe." She had been made a party to the suit by the Ashby children in their effort to force Gold to release and surrender something like $6800.00 worth of securities delivered by Richard Ashby to him. Reasonable inferences are found in the testimony about her prejudice and bitterness being traced directly or indirectly to Gold. He was not restrained by a court order from contacting this aged woman, but had been

as against Richard Ashby then 80 years of age. He and the members of his family were very attentive to Miss Donnelly. He kissed Miss Donnelly's hand on several visits to her "when his wife was present." He and other members of his family had drawn complicated wills for other old people. He was not a lawyer but a money lender and dealer in mortgages. We think there is ample testimony in the record to sustain the decree appealed from. See Sandlin v. Hunter Company, 70 Fla. 514, 70 So. 553; Travis v. Travis, 81 Fla. 309, 87 So. 762; Lucas v. Wade, 43 Fla. 419, 31 So. 231.

The decree appealed from is affirmed.

ELLIS, C. J., and WHITFIELD, J., concur.

BROWN and BUFORD, J. J., dissent.

## ON REHEARING

THOMAS, J.—The last will and testament of Mary A. Donnelly was admitted to probate by the county judge of Dade County the thirteenth of November nineteen thirty-four. In it testatrix made bequests to Mrs. Gussie Budge and Mrs. Clara Hunt, friends of long standing, and to J. Winifred Gold, Margaret Gold, William H. Gold (residuary legatee) or in the event of his death, Glenn W. Gold. The latter was named executor.

A few months later, Walter S. Ashby and others petitioned the county judge to revoke his action in allowing the probate of the will, claiming the same to have been executed when the testatrix was of unsound mind, and charging that it was the result of fraud and undue influence on the part of the residuary legatee.

A will bearing date of 17 March, 1924, was alleged to be

the true last testamentary disposition of Mary A. Donnelly's property.

Upon these issues the judge heard the testimony of witnesses introduced by the proponents and contestants, and denied the petition.

The Circuit court reviewed the ruling on appeal and disagreed with the County Judge, so the matter was presented here on an appeal from an order of reversal. After decision of affirmance by this court, a rehearing was granted.

A study of the record has revealed that testatrix was an elderly woman, who had for many years served as housekeeper for Richard Ashby, the widower of her deceased sister. Ashby and testatrix' sister had no children but the former, who died in the year nineteen thirty-three, was survived by two children and three grandchildren, the issue of his first marriage.

In May, nineteen thirty-two, Richard Ashby addressed a letter to William H. Gold, instructing him to assign to Mary Donnelly certain securities to insure her an income after Ashby's death and upon her demise they were to be delivered to Ashby's heirs.

About a year later, Ashby was declared insane in proceedings, according to some of the testimony, instigated by his children. In the same year, 1933, a decree was entered ordering Mary A. Donnelly to deliver to the guardians of Ashby the securities theretofore mentioned in Ashby's instructions to Gold.

The respective dates of the final order in the lunacy petition, the decree ordering return of the securities and the execution of the will involved in this contest were: March first, April twenty-ninth and November fifteenth, all in the year nineteen thirty-three.

It is strenuously and forcefully argued that, in the dis-

position of her worldly goods, Mary A. Donnelly was unduly influenced by William Gold and that the effectiveness of his selfish efforts to ingratiate himself was reflected in the provisions of her testament giving his family and him generous bequests, in fact all of her estate, except the legacies to two old friends.

This, of course, was a circumstance rightfully considered with all of the other facts in the case, and by itself might raise suspicion that Gold showed testatrix much attention during the years immediately preceding her death, thereby profiting because of the tractability of an aged person.

It was argued, too, that by his activity in procuring some one to draft her will he showed inordinate interest in her affairs and that this was further evidence of his exercise of undue influence over her.

In Theus v. Theus, 119 Fla. 190, 161 South Rep. 76, the court said that a will would not be rendered invalid because the sole beneficiary arranged its preparation and execution, nor would such fact raise the presumption of undue influence. It was stated that this would arouse "suspicious scrutiny." In other words, we understand that such an interest on the part of a beneficiary is but a suspicious circumstance to be considered with all other happenings throwing light on the will and intent of the testatrix when the instrument was signed by her.

Undue influence has been treated by the court repeatedly, but it seems proper to refer to these decisions again here. In Newman v. Smith, 77 Fla. 666, 82 South. Rep. 236, is found this exposition:

"Undue influence comprehends over-persuasion, coercion, or force that destroys or hampers the free agency and will power of the testator. Mere affection or attachment, or a desire to gratify the wishes of one beloved, respected, and trusted, may not, of itself, amount to undue influence affect-

ing the testamentary capacity of a testator. Ordinarily a presumption of undue and improper influence does not arise from the mere existence of interest or opportunity to exert such influence." 82 South Rep. text 246.

And, in Peacock v. DuBois, 90 Fla. 162, 105 South Rep. 321, the following quotation from Howard v. Farr, 115 Minn. 86, 131 N. W. Rep. 1071:

"To constitute 'undue influence,' the mind must be so controlled or affected by persuasion or pressure, artful or fraudulent contrivances, or by the insidious influences of persons in close confidential relations with him, that he is not left to act intelligently, understandingly, and voluntarily, but subject to the will or purpose of another." 90 Fla. 165, 105 South. Rep. text 322.

The degree of influence which is considered necessary to invalidate a will was also enunicated in Peacock v. DuBois, *supra*, wherein this statement appears at page 322 of 105 South. Rep.:

"The rule seems to be well settled that undue influence justifying the setting aside of will, deed, or other contract must be such as to dethrone the free agency of the person making it and rendering his act the product of the will of another instead of his own. The character of the transaction, the mental condition of the person whose act is in question, and the relationship of the parties concerned to each other, are all elements that may be taken into consideration in applying the rule. Johnson v. Farrell, 215 Ill. 542, 74 N. E. 760; Allday v. Cage (Tex. Civ. App.) 148 S. W. 838; Councill v. Mayhew, 172 Ala. 295, 55 So. 314; Mullen v. Johnson, 157 Ala. 262, 47 So. 584; Berst v. Moxom, 157 Mo. App. 342, 138 S. W. 74; Burnett v. Smith, 93 Miss. 566, 47 So. 117; Dingman v. Romine, 141 Mo. 466, 42 S. W. 1087; Franalin v. Belt, 130 Ga. 37, 60 S. E. 146; Francis v. Wilkinson, 147 Ill. 370, 35 N. E. 150; Wilcoxon v. Wil-

coxon, 165 Ill. 454, 46 N. E. 369; Marx v. McGlynn, 88 N. Y. 357, 370; DuBose v. Kell, 90 S. C. 196, 71 S. E. 371; Woodville v. Woodville, 63 W. Va. 286, 60 S. E. 140, 144."

See also Marston v. Churchill, just decided by the Court and not yet published. There is a distinct similarity between the facts in Marston v. Churchill, *supra,* and those in the instant case.

We reiterate that the county judge heard the witnesses in the contest and, therefore, had the opportunity to observe their demeanor on the stand. Thus he had a great advantage over the learned circuit judge, who had to rely on the printed record to learn the truth about the transaction.

The court has ruled that the conclusion of the probate court on conflicting evidence will not be disturbed unless the legal effect of the proof has been misapprehended or there is a lack of evidence to support the findings. Hooper v. Stokes, 107 Fla. 607, 145 South. Rep. 855; Parker v. Penny, 95 Fla. 922, 117 South. Rep. 703.

The right to dispose of property by last will and testament should be carefully guarded, and the courts should be reluctant to undo after death what the testator in life sought to accomplish by naming those whom he wished to inherit. Doubtless, this sentiment actuated the court in announcing that such instruments would be upheld unless it clearly appeared: "that the free use and exercise of a 'sound mind' * * * was prevented by deception, undue influence, or other means * * * otherwise the right given by statute * * * would be thwarted." Newman v. Smith, *Supra,* 77 Fla. 648, 82 South. Rep. text 241."

We have referred to the suspicious circumstance of the beneficiary having arranged for the execution of the will whereby he and members of his family received almost the entire estate of the decedent. There was considerable testimony that despite this activity on the part of the residuary

beneficiary, the disposition was utterly natural and free from the taint of undue influence. Gold and his family had shown Mary A. Donnelly much attention. She had been angered by the action of the contestant heirs in having Ashby declared insane. Her long association with Ashby was probably the reason for considering them entitled to her bounty. When, by their treatment of him, she was estranged it was not unnatural that she decided to ignore them in her will, any sentimental connection with them having been destroyed. Further support of this theory is found in the evidence of the suit to force Gold to disgorge the securities which he held, including those from which she would benefit under instructions to Gold from Ashby.

This is unquestionably the story the county judge believed. Against it he presumably weighed the testimony tending to show that Gold brought influence to bear upon testatrix, substituted his will for hers while he served in a representative capacity, with the result that he profited while the contestants, heirs of a man to whom her sister had been married, lost.

The judge who conducted the original trial had the power to make the comparison and if he found that the contestants' proof was outweighed by that of proponent, his decision, in the absence of misapprehension, should not have been disturbed by the able circuit judge.

Our examination leads us to believe that there was ample evidence to substantiate the original order and that it should not have been disturbed.

The order of the circuit court is reversed.

TERRELL, C. J., and BROWN and BUFORD, J. J., concur.

WHITFIELD and CHAPMAN, J. J., dissent.