JOHN N. WATTS, SR., et al., v. BEATRICE NEWPORT

6 So. (2nd) 829                      En Banc
December 19, 1941        Rehearing Denied March 31, 1942

Mabry, Reaves, Carlton & White, Whitaker, Whitaker, & Terrell, McKay, Macfarlane, Jackson & Fer-

guson, and Himes & Himes, Hampton, Bull & Crom, for appellants.

Dickenson & Dickenson, and Harry H. Wells, for appellee.

TERRELL, J.:

This case grows out of these facts. Letitia V. Graham moved to Tampa from Mississippi about fifty years ago. She invested the proceeds of some Mississippi lands in Tampa real estate, imposed on herself a life of rigid abstinence, and in the early 1920's because of failing health, converted her holdings into cash and gilt edge securities. She died December 16, 1938, leaving an estate of more than three hundred and fifty thousand dollars.

Mrs. Graham was about ninety-four years old at the time of her death and had no nearer relatives than cousins. She executed a first will dated October 8, 1921, and a second dated June 19, 1934, which were not materially different in essential provisions. Each provided modest legacies for friends and relatives and devised the major portion of her estate in trust to First Savings and Trust Company of Tampa for the purpose of erecting a memorial in Hillsborough County to be known as Edmund Gaines Graham Home in honor of her deceased husband, Edmund Gaines Graham.

In her real estate ventures, Mrs. Graham relied on the advice of W. H. Beckwith, one of the best realtors in this country. As an investor, she relied on A. C. Clewis, one of the soundest bankers in the country, and for legal advice, she relied on M. G. Gibbons, one of the most highly honored members of the bar of this State. For more than forty years, Mrs. Graham

counseled with these gentlemen, her fortune being the product of their advice, and her shrewdness.

On the day of Mrs. Graham's death, the appellee, Beatrice Newport, showed up with a third will which is shown to have been executed by Mrs. Graham August 20, 1937. It provides modest legacies for more than a dozen relatives and friends but devises the major portion of the estate to Mrs. Newport, "my friend of long standing." No one knew anything about this will prior to Mrs. Graham's death except Mrs. Newport, C. E. Sine, and his wife, all of whom testified that it was written by Sine at Mrs. Graham's dictation, and witnessed by Sine and his wife at her (Mrs. Graham's) request. Mrs. Newport promptly filed her petition to probate this will. The beneficiaries and others filed answers and protests to the petition alleging that it was the product of fraud, forgery, undue influence, and lack of testamentary capacity.

On the issues so made, after hearing much evidence and argument, the probate court found (1) that at the time the said will was executed, the testatrix was physically helpless, bedridden, practically blind, and incapable of dictating or executing it, (2) that at the time it was executed, the testatrix was not of sound mind and did not possess testamentary capacity, (3) that at the time said will was executed, Mrs. Newport was not a friend of long standing of Mrs. Graham, and that Mrs. Graham did not repose confidence in her, and (4) that the said will was the creature of fraud and imposition. He accordingly denied probate of the will and made a second decree denying petitioner her costs. Appeal was taken from both decrees. They were consolidated and considered together by

the Circuit Court and severally reversed. This appeal is from the latter decree.

. We are confronted with a single two phase question, viz: Was the will of August 20, 1937, forged, and did Mrs. Graham have testamentary capacity on the date of its execution? The evidence affecting both phases of the question is so interlarded that we treat them together.

To answer the question, this Court will first examine the record to determine whether or not the chancellor followed the correct rule of decision. The rule of decision is that if there is substantial competent evidence to support the finding of the probate judge and he did not misinterpret the legal effect of the evidence as a whole, his decree should be affirmed. In re Donnelly's Estate, 137 Fla. 459, 188 So. 108; Wilkins Estate, 128 Fla. 273, 174 So. 412; Alkire's Estate, 142 Fla. 862, 144 Fla. 606, 198 So. 475; Thompson's Estate, 145 Fla. 42, 199 So. 352.

Some confusion has arisen as to the effect of these decisions, it being contended that some of them depart from the rule as stated, that the Alkire case is in conflict with the Donnelly case and had the effect of setting up a new rule of decision, but we find no basis for such a contention and certainly there was no intention to change the settled rule in any of these cases. In the Alkire case, we did hold that each case was a law unto itself and that it was the duty of the chancellor to weigh the probative effect of the evidence as a whole but on mere probative value, he cannot substitute his judgment for that of the probate judge, nor can he try the case de novo.

The decree appealed from is planted squarely on the assumption that it was the duty of the chancellor

to examine the evidence as a whole and give the parties the benefit of his "own judgment based upon the entire record." In doing so, he reached the conclusion that the proponent proved the will and that when done, the burden shifted.to the contestants to show by a preponderance of the evidence that the will was forged or that Mrs. Graham was devoid of testamentary capacity when she is said to have executed it.

In giving the parties the benefit of his "own judgment based upon the entire record" the chancellor was in error. He cannot pit his judgment as to probative value of the evidence against that of the probate judge. He must find that the probate judge applied the wrong interpretation to the evidence. This was the last order the eminent chancellor made before being elevated to this Court. The words of Chief Justice Bleckley in Broome v. Davis, 87 Ga. 586, eulogizing another great judge of that Court are apropos: "Before the translation of our brother Lumpkin to this bench, though his judicial accuracy was remarkable, he shared in the fallability which is inherent in all courts except those of last resort. In some rare instances, he committed error, and the very last of his errors is now before us for correction."

Now let us see if the probate court misinterpreted the evidence as a whole. Mrs. Newport produced the will in question after the death of the testatrix; it abandoned an avowed purpose of Mrs. Graham for more than thirty years and devised the bulk of her estate to one that had no claim on her bounty; in the same stroke, it provided small legacies for blood relatives who did have a claim on her bounty. No one had previously heard of it but Mrs. Newport, Sine,

and his wife. Its preparation, execution, custody, and production were as mysterious as the change in purpose and the motives of those who had knowledge of it were challenged and discredited. It was in other respects irregular, as we shall presently show. The proponent of a will affected with so much irregularity is charged with proving more than its execution. She must prove that it was the free voluntary act of the testator. She must dispel the mystery that enshrouds it. Kelley v. Gottschalk, 143 Fla. 371, 196 So. 844.

This is a sound rule. It facilitates the search for truth and that is the only purpose of a lawsuit. When it is permitted to become a struggle for supremacy between the wits of counsel, truth is apt to be debauched and the administration of justice raped. The superior quality of the common law consists in its genius to take each case where it finds it, strike the boundary line between right and wrong, or truth and falsehood, and then proceed to enforce the right and restrain the wrong. When rules of procedure fail to accomplish this, the reason for them has vanished and they should be discarded.

In reviewing the evidence, we will not attempt more than a general statement of what it shows. To do more would make the opinion unnecessarily tedious. Mrs. Newport and C. E. Sine testified that Mrs. Graham dictated the will in question to Sine, that Sine wrote it and helped Mrs. Graham to execute it. It was witnessed by Sine and his wife. Sine said he had known Mrs. Graham for many years and had sold her some lumber but that his wife was not acquainted with her. There was ample evidence to the effect that Sine had not been in business for more than ten

years and was at best a casual acquaintance of Mrs. Graham, that the will was copied by him from one prepared by a third party at Mrs. Newport's request, and that Mrs. Graham knew nothing about it. Mrs. Newport testified that she had been intimate with Mrs. Graham since 1909, had bathed her, carried her food, and made trips with her to Memphis, Tennessee, and Coldwater, Mississippi. Her evidence was corroborated by three other witnesses, but the evidence of Mrs. Newport and all her witnesses was assaulted and seriously discredited. There was ample competent evidence to show that Mrs. Newport did not know Mrs. Graham prior to 1935 and that Mrs. Graham thoroughly distrusted her and had no use for her. The evidence on this point as a whole was in hopeless conflict; the probate judge lived in the community, knew most of the witnesses, saw them depose, knew their standing for truth and veracity and had access to other facilities for appraising the probative value of the evidence that the chancellor did not have and that we do not have. It was purely a question of veracity among witnesses in which the finding of the probate judge is final.

It is not disputed that at the time the will in question was executed, Mrs. Graham was more than ninety-two years old, that she had been in bad health for many years, and had been confined to her bed for more than two years, that her hands and back were drawn and rigid from arthritis, that she did not weigh over ninety pounds, was physically exhausted, was practically blind, that in less than seven months after the execution of the will, she was adjudged incompetent to look after her estate and a curator was appointed to take charge of it. Proceedings for such

appointment were started right after the execution of the will. In addition to these physical facts supporting mental incapacity, witness after witness testified that she did not possess mental capacity while other witnesses, some of whom were discredited and others were interested, testified that she was mentally competent.

All of the beneficiaries named in the will except Mrs. Newport were so confident that it was forged that they disclaimed the legacy in their behalf. There is much evidence in the shape of letters and post cards to show that the will is clothed in language that Mrs. Graham did not have in her vocabulary, and there is other evidence which may be reasonably taken as showing that Mrs. Graham could not possibly have executed the will in the manner stated by Sine and Mrs. Newport because of physical infirmity. The numerical weight of the evidence on this point preponderates in favor of the holding of the probate court.

The evidence as a whole is infected with some strange anomalies that support the contention of the contestants. It is equally as interesting as a study in human relations as it is one in legal dialectics. Mrs. Graham was the product of a school of economic thought that was reared to "salt down" a goodly portion of every dollar she acquired. She detested waste and was miserly to the extent of denying herself all the luxuries and many of the necessities. She was not cultured, knew nothing of belles lettres, and at least during her later years could not spell or construct a polished sentence, but in the knowledge of human beings, she was a wizard. She knew where to place a dollar to make it grow and in keenness of

intuition she could teach a suspecting wife new lines. She was endowed with a species of psychic telepathy by which she could bare one's conscience and reveal its processes. She would not "steal the show" at a levee of collegians, but judging from her estimate of human beings, she could teach the collegian loads about them. She did not know the Venetian lace and tapestries of the social structure, but she had a wonderful knowledge of the ham and eggs of it. She refused to be intrigued by the purveyor of gold brick, fake stock, or the importunities of "get rich quick Wallingford." The State did not have to shelter her under the paternal care of a blue sky law. She had no brief for fakirs and sycophants; in fact, her intolerance of that cast was so caustic that I am afraid if she had feigned to spit on one in a burst of passion, it would have cremated him.

It is common knowledge that when a person of balanced judgment gets ready to make a will, he calls in one in whom he reposes confidence. M. G. Gibbons had been Mrs. Graham's trusted counsel for more than forty years. He had prepared two wills and many codicils for her, the last codicil a few months prior to the will in question. She counseled with him after the will in question was executed and told him that the 1934 will was the only will she had. At least four times after the execution of the present will, she verbally reaffirmed her 1934 will. We find no explanation why Mrs. Graham overlooked her retained counsel and called in Sine, whom she never called on before or afterwards, to perform an important duty.

Neither do we find any explanation why Mrs. Graham departed from her purpose to establish a

memorial to her deceased husband. She persisted in that purpose for more than thirty years, provided for such a memorial in the wills of 1921 and 1934, re-affirmed her purpose in this after the execution of the will in question and so far as the record discloses, she never at any time expressed an intention to depart from this purpose to anyone but Mrs. Newport.

The will in question carries similar provisions for relatives and friends that were carried in the previous wills but abandons the main purpose and substitutes one who had no claim on her bounty. It is a strange aberration in human behavior for one to abandon a long expressed purpose to provide a memorial to a deceased husband and give the bulk of a large fortune to one who has no claim on her bounty and in the same act give insignificant legacies to blood relations who the record shows, she felt kindly toward, corresponded with, accepted favors from, visited each year as long as she was able to travel, and there is no showing whatever that she was estranged from any of them prior to the execution of this will.

Any testator has a right to disregard children and relatives and give what they have to a stranger but it is not the normal thing to do. Natural affection runs with the blood current; the law recognizes this and directs one's estate that way in the event of intestacy. When strangers come in to divert the current, they have the burden of explaining why the change if it is assailed.

After all, the proposition before us is one of weighing the evidence. We find ample competent evidence to support the finding of the probate court and the probative value of the evidence being the primary consideration here, his judgment is conclusive.

Changing the current of one's estate from the course repeatedly marked for it is not a trivial matter and should not be done except on conclusive proof that such was the intent of the testator. It will not be done on evidence challenged and discredited in the manner shown here.

With these considerations in mind, we have distilled the record (one of the largest that ever came to this Court) through the judicial retort and have extracted what we conceive to be the controlling elements. Except for the inherent improbabilities affecting the execution of the will, the opinion might have been much shorter. By inherent improbabilities, we mean those factors in which the provisions of the will run counter to natural affection or to a long expressed purpose. We felt it necessary to point these out and make it clear that the burden is on the proponent to explain when they are present and challenged.

The decree appealed from is reversed.

Reversed.

BROWN, C. J., CHAPMAN and THOMAS, JJ., concur.

BUFORD, J., dissents.

WHITFIELD and ADAMS, JJ., disqualified.

BUFORD, J., dissenting:

After a careful consideration of the record in the light of briefs filed, I am convinced that the decree of the circuit judge was without error and should be affirmed.

Counsel, in presenting the case in their respective briefs, sharply contradict one another as to what is shown by the record and, therefore, a careful study and checking of the record by each member of this

Court is essential to the fair and right disposition of the cause.

It would be futile to attempt to set out in this opinion even a summary of all the voluminous testimony taken and considered. It is sufficient to say that the record shows the challenged will to have directed a more logical and more natural disposition of testatrix's property than had been evidenced by either of the former wills. The provisions for bounty to relatives and those having some logical reason to expect to benefit from the devises were largely the same as those contained in prior wills. No fiduciary relation is shown to have existed between the donor and the chief beneficiary, Mrs. Newport. The bequest to Mrs. Newport does not appear to be unreasonable or unnatural, in view of the undisputed fact that for months prior to and after the execution of the will Mrs. Newport had been the only female in the world who, out of kindness and sympathy, had ministered to the comfort and well-being of the infirm old woman. Mrs. Newport had nursed Mrs. Graham, had prepared food which she could eat and had fed it to her as a mother would feed a helpless child. She had cleaned and bathed the old woman and had changed her clothing and linen and had ministered to her needs and necessities as a dutiful daughter would have to a helpless mother, even though it may not have appeared to be appreciated. All of Mrs. Graham's relatives were conspicuously absent. Mrs. Newport had procured nurses, chosen by Mr. Clewis who was Mrs. Graham's friend and financial adviser, to nurse and care for Mrs. Graham when no one else was giving any thought or concern to the old lady's pitiful condition. All the direct testimony is that Mrs. Graham

did execute the will in the presence of the subscribing witnesses as her last will and testament. The expert and circumstantial evidence is conflicting but, if anything, it is stronger and preponderates in favor of the premise that she did execute the will. The evidence is convincing that she possessed testamentary capacity at the time of the execution of the will.

The record fails to show that Mrs. Newport ever attempted to exercise any influence over Mrs. Graham as to the disposition of her property. There is no evidence that Mrs. Newport knew the contents of any former will executed by Mrs. Graham and, therefore, the identity of relatives who were named in this and former wills, and identity of the amounts of the legacies devised to them, and the identity and addresses of relatives and other persons named in the challenged will, were matters which could hardly have occurred by accident, but only from the intent and at the direction of the donor.

It appears in the record that in the will of October 8th, 1921, Mrs. Graham, after making bequests to certain individuals and to churches, bequeathed the residue of her estate to her executor and trustees named in the will for the erection and maintenance of an old peoples home to be known as the "Edmund Gaines Graham Home" as a memorial to her deceased husband.

In the will of June 19th, 1934, as she had in the will of 1921, after several special bequests, she made a residuary bequest of the balance of her estate to her executor and trustee named in the will to be used "for the erection and maintenance of an old peoples home to be known as the Edmund Gaines Graham Home, said home to be used for whites only, and not

to be used as an inmate by any person of African blood or descent." She provided for the site of the Home and directed how it should be built and for the appointment of trustees to have charge of and control of such Home. She provided a fund to be set up the interest from which was to be used to pay insurance on the Home and the up-keep of it.

The material difference between those two former wills and the will here under consideration is that in the latter several bequests were made to cousins and to other persons not of kin to her, not mentioned in former wills, though she did make identical bequests to many of those named in her former wills, and in lieu of providing for an old peoples home, she said:

"The residue of my estate, both real and personal, I give to my friend of long standing, Mrs. Beatrice Newport."

Then she said:

"I have discussed with her many times the things I want her to do and I have every confidence she will carry out my wishes."

In those former wills she had made no provisions for the maintenance of the inmates who might be taken into the Home which she directed to be erected, but, on the contrary, had directed that none of her estate should be so applied. Nor had she made any provision for the furnishing of the Home. The provision in regard to establishing the Home as contained in both former wills was fantastic and impractical.

Certainly, a devise to one who had ministered to her needs and had shown a real interest in her welfare while she was in a helpless and suffering condition was more natural than the provision for the old

peoples Home which was no more than half-way provided for.

As we read the record, the evidence shows beyond question that Mrs. Graham and Mrs. Newport had visited each other on numerous occasions beginning certainly not later than 1912 and that Mrs. Graham's visits to Mrs. Newport had been for a week or more at a time. When one woman visits another for a week at a time, we take it as conclusive evidence of their existing friendship. So theirs was a friendship of more than twenty-five years.

The record shows that Mrs. Graham signed checks on her bank account and directed her business affairs shortly before and after such that recognized experts declared it to be their opinion that the will was signed by the same person who signed the checks, while there are some as noted experts who testified to the contrary.

Certainly, the signature on the will is not a tracing of either of the signatures introduced in evidence.

We think from the entire record that it is established that Mrs. Graham did execute the will. We conclude that on the entire record the judge of the Circuit Court was justified in reversing the judgment of the Circuit Judge sitting as a Judge of Probate on the theory and ground that as Judge of Probate the Circuit Judge misinterpreted the legal effect of the evidence as a whole. In re Donnelly's Estate, 137 Fla. 459, 188 Sou. 108; Wilkins Estate, 128 Fla. 273, 174 Sou. 412, Alkire's Estate, 142 Fla. 862, 198 Sou. 475; Thompson's Estate, 145 Fla. 42, 199 Sou. 352.

Therefore, the judgment of the Circuit Court should be affirmed.