BARNS, Justice,
dissenting to the majority opinion and specially concurring with the opinion of the CHIEF JUSTICE.
The First National Bank of Miami, Executor of the Will of Marie A. Baldridge of November 19, 1951, offered the will in question for probate. Miriam Cannon, *661 mother and next friend of Jenny Lee Marks — also known as Jenny Lee Cannon —a grandniece of the testatrix, and Lena Hogan Hamilton, Executrix under a prior will, contested the will offered for probate and offered for probate such prior will. From an adverse decision admitting the will offered for probate by The First National Bank, the contestants Cannon and Hamilton took their appeal to the Circuit ■Court. That court reversed the judgment of the County Judge, holding that the bequests to Mertens, Gray, Karas and Wick-man were the result of undue influence vitiating the bequests to them, but affirmed the order of the County Judge otherwise in admitting the will to probate and denying the probate of the former will.
From the judgment of the Circuit Court, Mertens, Wickman, Karas and Gray took an appeal to this Court. Miriam Cannon, mother and next friend of Jenny Lee Cannon, and Lena Hogan Hamilton were named as Appellees. They took a cross-appeal but also named The First National Bank, Appellee in the Circuit Court below, as an Appellee herein.
The findings of the <Circuit Judge were as follows:
“Marie A. Baldridge, also known as Marie Astor Baldridge, executed a will on May 5, 1950, wherein she made Jenny Lee Marks, also known as Jenny Lee Cannon, her grandniece, the chief beneficiary with some specific bequests to old friends of many years’ standing. Among the property left to Jenny Lee Cannon was the homeplace which had been in the family for two generations. She incorporated this provision in that will:
“ ‘This property was conveyed to me by my mother with the request that if I retained it at the time of my death that I devise it to my said grandniece.’
“On November 19, 1951, being the day of her death, she executed another will. Therein she ordered the home-place sold and left substantial bequests to three persons whom she had known only a. relatively short time. * * *

“Marie A. Baldridge suffered from incurable cancer for several years pri- or to her death from that disease on November 19, 1951. She executed the will admitted to probate on the day of her death at about 10:30 a. m. and died about 6;00 p. m. On that day and for several days prior thereto, she was suffering agonizing pain and was administered opiates and narcotics at frequent intervals. On the morning of her death, according to the nurse’s charts, she w.as administered at least one dose of narcotics at about 6:00 a. m., but according to the doctor attending her she was administered another dose shortly after his arrival at 9:00 a. m.
“Without the knowledge of her old friends and family, Marie A. Bald-ridge was taken to Mt. Sinai Hospital in April, 1951 by Dorothy Mertens, where she stayed for about six weeks. She was under the care of Dr. William Wickman who was also named as a beneficiary in the will admitted to probate. According to the testimony of a disinterested witness who was an attending nurse, Dorothy Mertens gave instructions that no one except herself was to be allowed to see Marie Bald-ridge. However, toward the latter part of Marie Baldridge’s stay in the hospital when she had made some recovery, the nurse — at the request of the patient — telephoned Lena Hogan Hamilton who had been an intimate friend of the testatrix for about twenty-five years, requesting her to come to see her. Mrs. Hamilton promptly visited the hospital and according to the nurse they appeared to be close friends. At the request of the testatrix, this friend followed ,the ambulance home when the former left the hospital and continued to visit at the Baldridge home and render her care, comfort and attention until the latter went on her vacation in the summer.
*662 ' “While Marie A. Baldridge was at Mt. Sinai Hospital, Dorothy A. Mer-tens telephoned an attorney who had never previously represented the testatrix, asking him to go to the hospital to see Marie A. Baldridge about making a will and also asking him" about the cost thereof. The attorney did not find it convenient to go. On November 8, 1951, Dorothy Mertens again telephoned the same attorney, telling him to go to the Baldridge home as Marie Baldridge wanted to make a will. He went and found Dorothy Mertens there. He made notes, prepared a will and mailed a copy to the testatrix. Nothing more was heard by the attorney from Marie Baldridge. However, about 10:00 a.m. on the day of her death, Dorothy Mertens again phoned the attorney, telling him to go to the home, that Marie Baldridge wanted to sign the will. The testimony discloses that Marie A. Baldridge habitually used the telephone until a very few days prior to her death, yet she nevef called the attorney. Neither did she instruct anyone to call him except as testified to by Dorothy Mertens, a substantial beneficiary who is primarily charged with the undue influence. The latter testified that she did not see or talk to Marie Baldridge on the morning of her death so, she could have received no instructions to phone the attorney. She did testify that on the morning of the testatrix’ death, prior to the time she talked to the attorney, she talked to Mrs. Irving Karas who rented and occupied a'house on the Baldridge premises, and it is fairly deducible that she must have received information :from Mrs. Karas that Marie Baldridge was in critical condition.
“In addition to the radical change in the testatrix’ prior will covering her grandniece, Jenny Lee Cannon, there were other abrupt changes in the testatrix’ plans while she was on her deathbed. In her will of May 5, 1950, her testamentary plans were according to natural affection, running with the blood current and remembering her friends of long standing with gifts of' her personal belongings. They were altered or omitted in the will of November 19, 1951.
“Those remembered in the first wilS were — (1) Nellie Blake Hart who had been a friend and companion of the testatrix for a long number of years. She lived in the Baldridge home and rendered practical nursing to the testatrix until a few months prior to the latter’s death. She was left a platinum, diamond ring. (2) Mary Gallagher Clifton, another long-time friend,, who was given a platinum, diamond: and sapphire bracelet. (3) Lena Hogan Hamilton, an intimate friend for twenty-five years, was named executrix and given a piece of jewelry and! certain chinaware. (4) Miriam Cannon, niece of the testatrix, was to receive her automobile. (5) The grandniece, Jenny Lee Cannon, in addition to the homeplace was left the furnishing and equipment therein and by virtue of the residue would have received all of the clothing, personal effects, jewelry and chinaware not the subject of specific bequests abovementioned. (6) One Thousand Dollars was left to the Dade County Cancer Institute.
“In the will of November 19, 1951, the grandniece was included but with no specific bequest and a substantially ' reduced residue. All of the other parties named above were left out and the following were added: (1) Dorothy Mertens was substituted for Jenny ' Lee' Cannon as to the household furniture, furnishings, equipment, personal effects and clothing. In addition, Dorothy Mertens was left the most expensive item of jewelry owned by the testatrix, being a three-diamond ring of the appraised value of $2,800.00. In addition, she was given $2,000.00 in cash and was given the automobile previously left to the testatrix’ niece, Mir'iam'Cannon. (2) .Dr. William Wick-man was substituted for the Dade *663 County Cancer Institute and was left $1,000.00 for cancer research. (3) Lina Gray was left One Thousand Dollars. (4) Mrs. Irving Karas was left three diamond, sapphire pins. The above cash bequests were apparently the reason that the testatrix had to order the homeplace sold because at the time of her death she had only about $2,800.00 in cash, and in May 5, 1950, the only cash bequests wére $500.00 to Sts. Peter and Paul Catholic Church and $1,000.00 to Dade County Cancer Institute with the direction that if the residue of cash was not sufficient, that this bequest should be cut to $500, or •one-half of the cash residue.
“It is apparent that an influence was at work upon the diseased and weakened mind of Marie A. Baldridge during the last few weeks of her life, to create a hostility toward an estrangement for her family and lifelong friends. Inasmuch as Dorothy Mertens, Mrs. Irving Karas, Lina Gray and Doctor Wickman were the only constant visitors at the Baldridge home during the last few weeks of her life who benefited from the deathbed will, it must be concluded that they exercised undue influence and therefore the burden was upon them to show otherwise. The Court is of the opinion that this burden was not met.”
The findings of the County Judge were as follows:
“That the Decedent, Marie Astor Baldridge, on the 19th day of November 1951 was of sound mind and disposing memory, as required by the laws of the State of Florida in such cases made and provided, and of testamentary capacity, with knowledge of the full extent of her estate, the disposition of the same that she desired to make, and the natural objects of her bounty.
‘The Court further finds that on said date the said Marie Astor Baldridge executed the Last Will and Testament dated November 19, 1951 as her own free act and disposing deed, without fraud, coercion or undue influence.
“The Court further finds that by the execution and publication of the Last Will and Testament of the 19th of November 1951 the Testatrix, Marie Astor Baldridge, did revoke the Last Will and Testament by her executed on the 5th day of May 1950.”
Facts.
Marie A. Baldridge was a middle-aged woman at the time she died. Her death was the proximate result of cancer. For several years she had been affected with the disease and had incurred operations in an effort to terminate its progress. She was a single woman, having been divorced a number of years prior to her death. She was apparently close to her mother, but did not maintain cordial relations with her sister, Genevieve Heironymus. Prior to the death of her mother in November, 1949, her mother executed a deed conveying to Marie A. Baldridge the home place, being about all of the family property. At the time of the conveyance, her mother requested that part of the property, Lots 2 and 3 of Block 95 South, Miami, Florida, be conveyed to a grandniece, Jenny Lee Marks, in the event Marie A. Baldridge held the same at her death. This request, which in and of itself would appear to have been part of the consideration for the original conveyance to Marie A. Baldridge, is clearly set forth in paragraph IV of the Last Will and Testament of Marie A. Bald-ridge executed on May 5, 1950.
After the death of the mother, one of the daughters, Genevieve Heironymus, by suit contested the validity of the deed to her sister, Marie A. Baldridge, the testatrix of the alleged will. This action on the part of Genevieve Heironymus, the grandmother of Jenny Lee Marks, created further animosity between the two sisters.
This was the situation at the time of the execution of the Last Will and Testament dated May 5, 1950. By the terms of that will, the request and understanding on the part of Marie A. Baldridge’s mother was *664 honored by the testatrix. Certain old friends were the-object, of specific legacies. Among these were Lena Hogan Hamilton, a close friend and companion of some 20 years; Nellie Blake Hárt, a companion and household attendant for a great number of years; and Mary Gallagher Clifton, also a long-time companion and friend. Miriam Cannon, a niece of Marie A. Baldridge and the daughter of Genevieve Héirony-mus, was remembered to the extent of a Dodge automobile. In addition, a specific bequest was made to Sts. Peter and Paul Catholic Church and to the Dade County Cancer Institute. Jenny Lee Marks was left the residue of the estate, including the said Lots 2 and 3. The testatrix’ devoted friend, Lena Hogan Hamilton, was appointed executrix of the will. The majority of the estate, which consisted of family real property with improvements thereon, went to a grandniece, Jenny Lee Marks, who, though a granddaughter of Genevieve Heironymus, .was completely disassociated from the family disputes.
Subsequent to the execution of the will of May S, 1950, and on the very day of her death, Marie A. Baldridge executed a new will which voided the prior will and completely altered the testamentary disposition of the deceased’s property. The request of Frances H. Baldridge, mother of the testatrix, that Lots 2 and 3 be devised to Jenny Lee Marks was dishonored; and in place of old friends, Nellie Blake Hart, Lena Hogan Hamilton and Mary Clifton — an array of new-found friends, including one Dorothy Mertens, Lina Gray, Mrs. Irving Karas, and Dr. Wickman, her attending physician, were substituted as special legatees. The First National Bank was made Executor of the alleged will of November 19, 1951; and further, the Executor was designated as guardian of any funds that might accrue in favor of Jenny Lee Cannon by virtue of the residuary clause.
Miss Baldridge had had an attorney, Thomas H. Anderson, who had served' her for a considerable period of time prior to her demise. Neither he nor the attorney who drafted the will of May 5, 1950 was requested by her to draw the death bed Will. Miss Baldridge had never met Mr. Redfearn until a few days prior to her death. She never contacted him, but while she was in, the hospital in the summer of 1951, Dorothy A. Mertens called Mr. Red-fearn and asked him to come- to the hospital for the purpose of drawing a will. For some reason, the latter did not do so. On November 8, 1951, 11 days prior to the death of the testatrix, Dorothy Mertens again called Mr. Redfearn and asked him to go to the home of Miss Baldridge as she wanted to make a will. The testimony in the case discloses that Miss Baldridge, up to that time, constantly used the telephone but she did not call Mr. Redfearn. The latter went to the home and made some notes and prepared a will, carbon copy of which’ he sent by mail to her home. Nothing further was heard by Mr. Red-fearn until the morning of November 19, 1951, when Dorothy Mertens again called him and told him to go to Miss Baldridge’s home, as she wanted to execute the will. Mr. Redfearn then telephoned the' home and talked to Dr. Wickman who said, referring to Miss Baldridge — “She is in a critical condition.”
The. testimony of Dr. Wickman is enlightening as to events succeeding the arrival of Mr. Redfearn.
“Q. When Mr. Redfearn arrived what happened then? A. He asked me again what the condition of Miss Baldridge was, and I again repeated that it didn’t appear too good, that she was getting weaker, I didn’t think she had too long to go.
***** *
“Q. Did you indicate that if Miss Baldridge were to sign a will she better do it now? A. I did, yes.
“Q. Why? A. Well, I felt that she probably didn’t have too much longer to go. The lawyer was there. And it just seemed the proper thing to do. I know I was taught — at medical school we had a couple of sessions on this — we were taught that if a patient did express a desire to make a will, to encourage them and to help them as *665 much as you possibly could; and that is all I was doing.
“Q. Did Marie A. Baldridge express a desire to you to execute a will ? A. No.”
Mr. Redfearn verified the critical condition of Miss Baldridge when he arrived at the home by his testimony:
“ ‘Oh, I feel so bad I don’t know whether I can sign it now or not.’
“I said, ‘Well, you don’t have to sign it now. I can come back again. It’s all right.’
“She said, ‘Well, I wanted to make a change in it anyway.’
“I said, Well, if you will tell me what the changes are I will go back to the office and make them or come back the next day if you want it done that way.’ I then asked Dr. Wickman what her condition was, and he said she was in critical condition. So I spoke to Miss Baldridge again. I said, ‘If this will is satisfactory to you, we will sign it now. If it is not, we will make any changes in it — I will make them in pen and ink now if you want it done.’ “She said, ‘Lift me up.’ She asked me to raise her -up. I put my hand under the top pillow and raised her up in a semi-sitting position, and the nurse rearranged the pillows, and she said — She kind of had a coughing spell. I understand she was dying of cancer. * * * ” (Emphasis ours.)
The draft of the will was thereafter changed by interlineation, was initialled and was signed by the testatrix in front of the witnesses. The testimony was uncon-tradicted that Miss Baldridge did not request any of the witnesses to come into the room, and, further, that she made no statement 'concerning the will in their presence. The will was not read to the decedent at any time, either prior to the entry of the witnesses or in their presence.
After the execution of the will, Mr. Red-fearn testified he told the decedent he would take the original will and hold it for safekeeping, but that the carbon copy would be left with her.
Dr. Wickman’s description of the patient at the time of the execution, of the will was as follows:
“Well, she was a very sick patient. Her lower extremities were edematous. She had a large mass presenting in the upper right quadrant of the abdomen, which to me represented metastatic disease of the liver. She had a large ulcerating lesion of the skin of the left chest wall. .She had numerous nodular areas, representing metastasis throughout the left chest wall sur.rounding the left arm. She was emaciated. And she just represented what a physician would call a terminal stage of carcinoma.”
Dr. Wickman also said that poisons were accumulating in her system and made the statement that when he arrived around 9:00 or 9:30 a.m., November 19, 1951, he felt she definitely looked much worse and that he thought she was dying.'
The attending nurse testified:
“Dr. Wickman told me (he left at 11:00 a.m.) to give her her last glass of warm milk. * * * (30 minutes after execution of the Will.) -So when she drank an ounce of that milk the blood was running out of her mouth. * * * That was the day she died.” (Parentheses ours.)
The notes of the nurse for the two days preceding November 19, the day of the signing of the last will and the day of Marie’s death, are as follows:
"Saturday, Nov. 1Tj — 6:30 a.m.-r— back on pillows. ■ 6:35 — muttering, grunting, respirations at times. .10:40 : — Dr. Wickman notified of condition. Patient — no pain — drowsing. Chief complaint:. Weakness. 10:30 p.m.— request for extra cover and sleep medicine. — Demerol 1 cc IM. 3:15 a.m., Nov. 17 — awake, coughing.' Demerol 1 cc. pulse thready, running. 3:30— *666 7^- cc. Rx liq. Sat. Nov. 17, ’51. Dozed at' short intervals. 6:00— Coughing repeatedly — tomato juice 100 cc. 6:30 — States she has not been sleeping. Pulse frequentj barely palpable. Rx zi restlessness. Voided 150 cc — very concentrated. Warm milk 250 cc. 9:30 A.M. — States she is very sick. Gown changed. Returned to sleeping position on right side — sleeping — grunting type respirations, shallow, pulse poor. Resp. 20. Has to open and close mouth with each feeble breath. Sat. a.m. Nov. 17, 1951. Saturday Nov. 17 — 1951. Napped, scratched shoulder, brought some blood from same between 7 and 8 a.m. Slept one hour, less coughing, nausea, absent. Out of bed to pan ón chair. Insisted on getting up. Chest and shoulder covered Rx mixture. Sat. a.m. Nov. 17 — 1951. 11:20 — Patient awake. States she is very uncomfortable and will take anything that will make her feel easier. Lips cyanotic. Demoral 1 cc IM. (50 Mgm). Returned to and slept 1% hours. Very happy having had a good rest. Sat up (weakly) to mop perspiration from head and shoulders. Slept 20 min. 2:00 — enjoying 250 cc cold milk. 2:40 — has been sitting in bed sleeping. 2:55 — Demoral 50 MGM I.M. for gagging nausea. 3:05 — Sitting feels very nervous. 3:35 —Back on pillows on right side — very quiet- — drowsy, grunting, opens mouth to get each breath. Very lucid, voice always strong and clear when expressing wishes or complaints. 5:10 — Restless at short intervals and complaining of weakness. Does not wish medicines and promises to take broth, etc. later. 7:45 — has been resting scratching chest, one spot raw. Pulse stronger 98 — 20. 8:10 — requested and took 240 cc. warm milk. 8:30 — Drowsing in sitting position. 9:00 p.m. — light evening care. Rx zi for restlessness. Extra blanket. Rx mixture to chest. Sat. 'Ev. Nov. 17, 1951: 9:15 — on side —sleeping and moaning. 10:30 — Can’t get settled. Pulse 88? Very poor— has not voided since 9:30 A.M. — slight fecal odor about. 10:30 — Demoral 50‘ mgm. I.M. Back rub. 11:30 Cup hot. tea 50 cc. — cannot get settled — requested extra cover. 11:40 — lying in rt.. side, sleeping, lips cyanotic, grunting type resp., gasping motion of R. lips- and each respiration 20.
“1:10 — increased muttering throughout day and night at intervals. Became increasingly uncomfortable since.. 2:00 a.m. — Demerol. Position changed' frequently. Slight mental confusion this a.m. Now more quiet and co-mf. sitting on side of bed with feet over and supported by stool. (Emphasis, added.)
"Sunday a.m., Nov. 18, 1951: 2:30' Rx zi for restlessness. Slept quietly for short intervals — sitting up, then lying down, muttering, frequent coughing. 4:45 a.m. — Demoral 50 mgm. (1 cc.) IM. Restless, severe backache.. Request for shawl. Sips H2O — appearance very poor. Continued shallow grunting resp. (4:44). 9:00 a.m.— sleeping, groaning and moaning. Lips-blue, dry. Fecal odor to breath — abdomen and chest full and rigid. Adverse to any liquid nourishment. Body cold, external heat and covering. 10:30’ —Demoral 50 MG 1 cc. I.M. Mind very clear, voice full, Anxious strained expression. Patient sitting. Has. slept 50 minutes. Dyspnoea but states, she is not too bad. Tried to use female urinal then b. pan in bed. No use. Decided to use pan in chair. 150 cc: voided Pt. greatly exhausted. 12:40— now sitting up in bed breathing quietly. Sunday noon — November 18, 19511 Has been sitting up and going back to rest .on side. Lips quite cyanosah Hacking for few seconds of gagging,, raised bloody (fresh) shreds @ 12:20 Codeine tab. 12:25 sips water. 1:00— has been sitting up for 5 min. 3:00 —Sitting up for rest of back. Requested back rub for tiredness. 4:30 —states she is fairly comfortable. Warm milk 150 cc. 7:15 — has been alternating position between sitting and resting against pillows with right *667 ■side — unable to lie low — wishes to get up to bed pan on chair. Voided 150 cc. lighter urine. Very weak and for time cyanotic — labored breathing present. Patient had to rest on side of bed before full return to same. Pulse feeble, rate questionable. States she cannot get enough sleep. Sleeping % hour. 7:30 PM — milk 30 cc. 8:30— sitting up slight occ. cough — napkin ■stained with blood. 8:35 — Cod. tablet for cough and bloody stain and general lack of ability to go into a restful .sleep. 11:15 — voided in female urinal '(first time able to get patient to stay in bed for same) — 160 cc. 11:15— Demoral 1 cc @ 11:50. Oedemia increasing tho output of urine voided increasing. States she sleeps well part time but is in agony to breathe. 11:50 —Demoral for relief. Great facial pallor — oedema present, eyes protuberant, voice and determination strong, would not have external heat, Temp. 96.
“Sat. Dem. 4:45 p.m. Sunday Dem. 10:30 a.m. Cod. 12:25 p.m. Cod. 8:35 p.m. Demoral 1 cc. 11:50.”
The opponents appellants called as witnesses two of the outstanding experts on neuro-psychiatry and a surgeon who qualified as an expert in the cancer field. The former two were Drs. James L. Anderson and William H. Izlar, and the latter was Dr. Harold S. Kaufman. To the hypothetical question directed to these doctors, each testified in substance that the testatrix, Marie A. Baldridge, was not possessed of her normal mental faculties so as to comprehend the effect and result of executing a will.
Dr. Anderson went so far as to say in layman’s language which we can understand :
“I don’t think anyone on the day of their death from cancer understands fully what they are doing.”
Dr. Harold S. Kaufman, a surgeon skilled in operating cancer cases, testified that in his long experience with cancer patients, he had never known one dying a slow, deteriorating death to be competent to transact business on the day of death. Furthermore, as has been noted from the testimony of the attending nurse and physician, the testatrix was suffering from a great accumulation of fluids. According to Dr. Izlar:
“ * * * With that she had a decrease in kidney function in which you get nitrogen retention. Both of those give rise to a state of mental confusion in which a patient’s recent memory is impaired.”
The hypothetical question directed to the Doctors was a9 follows:
Hypothetical Question
“Marie A. Baldridge died on November 19, 1951, at about 5:00 p. m. She was then at the age of about 55 years. In 1947 she underwent surgery for carcinoma of the left breast. In 1950 she underwent another operation for carcinoma of the right axilla, and a recurrent carcinoma on the left chest. From time to time she was given X-ray therapy to these parts of her body, from which she suffered severe burns down through the thorax.
“After the second operation fluid was extracted from her for a considerable number of times. Incident to the accumulation of this fluid, she experienced shortness of breath. During her illness the patient was given sedatives and narcotics, such as is usual or customary in such cases. About six days prior to her death she was suffering from terrible pain, couldn’t rest, and would drop off into sleep because of exhaustion. She had no pulse in her wrist, but a slight temporal pulse could be detected.
“She had three hemorrhages prior to her death, the first one being on the second day before her death. During this time there was very slight kidney function. On the night before she died her lower extremities were just *668 bags of water, and her legs were leaden, heavy and cold, like ice. On that night for the 'first time she didn’t put her arm in a sling above the bed, which she had always done in accordance with the doctor’s orders. She had a very bad night, with practically no rest. There was very little elimination of urine and practically complete blockage as far as the liver was concerned.
“Beginning at 6:30 p. m. on November 15, 1951, being the fourth day preceding her death, she was administered 1 cc. of demerol; at 9:30 p.m., 1 cc. of demerol; at 10:00 p.m., 25 milligrams of demerol. On November 16, 1951, the chart shows that the doctor ordered 1 cc. of demerol every three hours; but the chart shows dosage only at 6:30 a.m. on that date.
“On November 17, 1951, at 3:15 a.m., she received 1 cc. of demerol; at 11:20 a.m., she was administered 1 cc. of demerol; at 2:55 p.m., 1 cc. of demer-ol; and at 10:30 p.m., 1 cc. of demerol. On November 18, 1951, being the day prior to her death: at 4:45 a.m., 50 milligrams of demerol; at 10 :30 a.m., 50 milligrams of demerol; at 12:25 p.m., codeine tablet, at 8:35 p.m., codeine; at 11:50 p.m., 1 cc. of demerol. On November 19, 1951, at 2:00 a.m., demerol; between 6:30 a.m. and' 8:00 a.m., 25 milligrams of demerol.
“According to the nurse’s charts that have been offered in evidence, here, the patient during the 25 hours before her death was muttering throughout the day and night at intervals.
“On the night prior to her death the nurse was up with the patient all of the night. The nurse who last attended her stated, ‘She never slept much. She was always half asleep and half awake. She never slept more than thirty minutes until that last sleep.’ This nurse did testify that the patient was mentally alert even including the day of her death. Between 10:00 a.m. and 11:00 a.m. the day she died she signed a last will and testament, changing a previous will which had been made in May of 1950. In that will, the will of May, 1950, she had devised substantial real estate to her grandniece, which real estate had been deeded to her by her mother; and in the will of May, 1950, she said she was devising this property to the grandniece at the request of her mother. In the will made on November 19, 1951, she directed that this real estate be sold and certain of the proceeds be given to persons other than the grandniece.
******
“In view of your medical training and experience in the practice of medicine, what is your opinion as to the mental condition of Marie A. Bald-ridge on the morning of November 19, 1951, particularly considering the medications which were administered to her for the days preceding her death, as have been described to you?”
Mental Incapacity Resulting From Opiates
The Appellant-attending physician testified with reference to the morning of the execution of the will as follows:
“I say I don’t know what effect the opiates had on her that particular morning. I just didn’t observe her from that particular standpoint.”
Dr. Izlar on cross-examination analyzed the effect of opiates administered to the testatrix as follows:
“A. Well, I think that an individual who has been taking demerol for that long a period of time, whether they have taken a dose at this hour or two hours later, the effect of the narcotic influences their mental decisions.
“Q. You say you think it does? A. I do.
“Q. During the time that one is under the influence of demerol is it impossible to awake one from the stupor *669 and for that person to exercise any willpower? A. Well, you can wake them from a stupor. In fact, a lot people who take demerol in doses "like this won’t go to sleep. They might doze off, but you certainly wouldn’t call them in a stuporous state.
“Q. Well then, would you say that those people who may be wakeful are unable to transact any business and do not know the full effects of their decisions? A. That is my opinion, due to the effects of the medication.”
Further describing the effect of narcotics, Dr. Izlar gave the following opinion:
“Any individual who takes that amount (of narcotics), regardless of who he might be, over a period of that length of time would have a certain addiction for it. The addiction varies due to the amount of drug the individual has. Some of them take tremendous doses. But with that history an individual would be addicted to some extent from it.
“Their thinking and reasoning at that time is influenced by the narcotic, in that it gives them a state of euphoria, or well-being; and that influences their judgment and reasoning.
“In analysis of her physical state, as outlined by this question, there are several points that you would have to consider. One is that there was a disturbance in her fluid balance and that she had a water retention. With that she had a decrease in kidney function in which you get nitrogen retention. Both of those give rise to a state of mental confusion in which a patient’s recent memory is impaired.
He * * 4= * *
“ * * * Therefore, it is my opinion, based on that assumption, that an individual that had taken this narcotic and was in that physical state was not competent from a mental standpoint.” (Parenthesis ours.)
Dr. Kaufman testified that it was his opinion that Marie A. Baldridge was mentally incapacitated to execute a will on the morning of November 19, 1951, as a result of the drugs constantly administered to her during her last illness.
Conclusions.
In a will contest an appellate court usually accepts the trial court’s resolution of a question of fact when based on conflicting evidence, but when the question of fact resolved is based on an inferential fact drawn from nonconflicting evidentiary facts the appellate court is as competent as the trial court to deduct inferences of fact. When there are conflicts in the evidence as to any material fact the trial court has many advantages not available to an appellate court, and, furthermore, it does' not follow that the trial court is in error merely because the appellate court would have come to a contrary conclusion in resolving the conflict as to an evidentiary fact relating to the ultimate fact in controversy. The appellate court is as free as the trial court to determine what inferential facts are established by the non-controverted evidence.
It is the function of the trial court to pass upon the credibility of the witnesses in event that question is involved by reason of conflicts in the evidence as to any factual matter. In re Estate of Donnelly (Gold v. Ashby), 137 Fla. 459, 188 So. 108. A finding of fact by the trial court in a non-jury case will not be set aside on review unless there is no substantial evidence to sustain it/unless it is against the weight of the evidence, or unless it was induced by an erroneous view of the law. A finding which rests on conclusions drawn from undisputed evidence, rather than on conflicts in the testimony, does not carry with it the same conclusiveness as a finding resting on probative disputed facts, but is rather in the nature of a legal conclusion. 3 Am.Jur. 471. When the appellate court is convinced that an express or inferential finding of .the trial court is withoht support of any substantial evidence, is against the weight of the evidence or that the trial court has misapplied the law to the established facts, then the deci *670 sion is “clearly erroneous” and the appellate court will reverse because the trial court has “failed to give legal effect to the evidence” in its entirety. We may not he required to state wherein the lower court has “failed to give legal effect to the evidence” when we reverse on that ground, hut under such circumstances propriety dictates that we should.
It is well recognized that one normally competent may be incapacitated by alcohol, drugs, fever, disease or shock. The facts in the case at bar have as much in common with the leading case of Newman v. Smith, 77 Fla. 633, 667, 82 So. 236, 241, that we feel justified in quoting as follows:
“In the making of a will a ‘sound mind’ comprehends ability of the testator to mentally understand in a general way the nature and extent of the property to be disposed of, and the testator’s relation to those who would naturally claim a substantial benefit from the will, as well as a general understanding of the practical effect of •the will as executed. The free use and ■exercise of a 'sound mind’ in making a will may be prevented in many ways; 'but if a testator has a ‘sound mind’ when he makes a will, its free use and •exercise will be assumed until the contrary clearly appears. In proceedings seeking a revocation of the probate of a will under the statute the court is required to decree ‘according to the law and justice of the case.’ This has reference to ascertaining whether the will duly expresses the free and lawful intent of a competent testator. While findings of fact by a trial judge ■upon conflicting evidence should ordinarily not be disturbed on appeal where there is ample evidence to sustain the finding, yet where the trial judge misapprehended the legal effect of the evidence as an entirety, and, in a case of this character if the finding is not ‘according to the law and justice of the case,’ as required by the statute as well as by the general principles of law, the finding of the trial judge should not be sustained merely because there is evidence that is contradicted, on which the finding may be predicated. * * *
“To reach a proper conclusion, we must consider undue influence and mental capacity together. The testimony discloses that a potent influence was at work to secure the execution of this will, and that everything connected with it emanated from some one other than the testator. Some one, not the testator, selected the time for making the will when his mind was fixed on his physical condition, and he was in great fear and dread of death, to the exclusion of other matters — a time when he was under the soothing and drowsy influences of morphine that had been administered three times a day for several days; some one, not the testator decided to have the will made; some one not the testator sent Thrower to tell Mr. Himes to go to the hospital; and some one, not the testator told him what disposition was to be made óf his property. From the beginning to the end of the transaction the testator was merely a passive instrument in the hands of some one, and we cannot escape the conclusion that the will was not his spontaneous act. Jarmon on Wills (6th Ed.) 49; Tribe v. Tribe, 1 Rob. [Ecc.] 775, 13 Jur. 793; Dufaur v. Croft, 3 Moore, P.C. 136, 13 Eng.Rep. (Full Reprint) 59; Longford v. Purdon, supra.
******
“The disposition of the property was in derogation of the public policy announced in our statutes of descent; it did violence to the dictates of natural affection; it repudiated all his former protestations of love for his child; it broke promises iterated and reiterated that he would provide for her after his death. Undue influence can seldom if ever be established by direct evidence; but we often find it conclusively shown by' its results, and it may become the only legitimate inference from the facts and circumstances in the case. Here it changed *671 the disposition of the property that was fair, and prompted by the dictates of affection and regard for those having claims on the testator’s bounty, to one where these were flagrantly violated, and it disregarded the moral obligation resting upon him to carry out his promises, so often made, to provide for his child after death. We do not mean to say that a will should be disturbed merely because it is unreasonable and unjust, but where, as in the instant case, it does violence to the natural instincts of the heart, to the dictates of fatherly affection, to natural justice to solemn promises, to moral duty, such unexplained inequality and unreasonableness is entitled to great influence in considering the question of testamentary capacity and undue influence.
******
“In reaching a conclusion from the evidence in this case we do not have to rely upon one circumstance alone to establish mental incapacity and undue influence. Their indicia are numerous. A much-loved and needy daughter disinherited; an affluent wife, held in slight regard, given all his property; a former will, equitable, rational, and just disregarded; solemn promises broken; the ties of fatherly affection destroyed; the total absence of spontaniety on the testator’s part to do anything connected with the making of the will or its contents ; dubious testimony to support the will that would strain to the utmost the credulity of the most trustful; letters and telegrams sent to the father intercepted, and ignored until the wife is advised that the daughter is coming to her father at once, and then a telegram promptly sent to prevent her coming. In this condition of the testimony do we need the opinion of physicians as to the mental capacity of the testator? And, if we do, shall we accept that which accords with all the other facts or that which does violence to them? The facts in this case speak so strongly that we would have reached the same conclusion without Dr. Helms’ opinion, which fortifies, but does not control, our judgment that this will is the result of undue influence exerted upon a mind not possessed of testamentary capacity at the time it was executed.”
The probative evidentiary facts recited in the nurse’s notes, the evidentiary facts recited in the findings of the Circuit Judge, and the evidentiary facts recited in the hypothetical question propounded to Doctors Izlar, Anderson, and Kaufman, are without substantial controversy. From these facts and all the other facts and circumstances it is my conclusion that the will in question was executed while in extremis when the testatrix was not exercising the free use of a sound mind and that the will is not the expression of her free intent, and it was error to admit it to probate.
The case should stand remanded to the County Judge’s Court with directions to proceed not inconsistent herewith.
I therefore dissent.
ROBERTS, C. J., concurs.